NIGHT BOX
FILED

ᴄᴜʀ  7 1996

IN THE UNITED STATES DISTRICT COURT   CARLOS JUENKE
SOUTHERN DISTRICT OF FLORIDA   CLERK, USDC / SDFL / MIA

MICHAEL A. HAGGERTY,          Case No. 95-8308-CIV-MORENO

      Plaintiff,

vs.                          **MOTION IN LIMINE TO EXCLUDE**
                             **MEDICAL CAUSATION OPINION**
THE UPJOHN COMPANY,          **TESTIMONY OF DEBORAH MASH, PH.D.**

      Defendant.

_____/

COMES NOW Defendant, The Upjohn Company, by counsel, pursuant to Fed.R.Evid. 104(a) and respectfully moves the Court to exclude from evidence the opinion testimony of plaintiff's expert witness Deborah Mash, Ph.D., on the issue of medical causation on the ground that Dr. Mash's causation opinion is not grounded in the methods and procedures of science and is not relevant and therefore should not be admitted into evidence pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).

In support of its motion to exclude the medical causation opinion testimony of Dr. Mash, Upjohn submits the following statement of facts, by general category relevant to a Daubert analysis, pertaining to the scientific invalidity, unreliability and inadmissibility of Dr. Mash's medical causation opinion.  There is no conflicting evidence with respect to the essential factors to be analyzed under Daubert because Dr. Mash has admitted and conceded these critical facts.

### STATEMENT OF FACTS

#### Dr. Mash's Medical Causation Opinion

1.   Dr. Mash expressed the opinion that Halcion caused the following psychiatric and behavioral effects in plaintiff on April 20, 1991: hallucinations, aggression, paranoia, agitated delirium, hostility, anxiety and suicidal behavior.  Deposition of Deborah A. Mash, Ph.D, (hereinafter "Mash Depo."), pp. 200-01, 226, Ex. "A".

#### Dr. Mash's Methodology

2.   The methodology employed by Dr. Mash in forming her causation opinion relies upon the following data:

- spontaneous reports of adverse medical events (drug experience reports or "DERs") collected by the Food and Drug Administration ("FDA") in its Spontaneous Reporting System ("SRS"); Mash Depo., pp. 118-19, 200, Ex. "A";

- anecdotal case reports in the medical literature; Mash Depo., p. 200, Ex. "A";

- references in a textbook to non-Halcion studies of psychomotor agitation in rats and mice; Mash Depo., p. 201, Ex. "A";

- articles in newspapers and the lay press and correspondence to the FDA from the "public interest" group Public Citizen, marked as Deposition Exhibits 5 and 10.  Mash Depo., pp. 118, 126-27, 203, Ex. "A";

- "secondary citations," which are abstracts or titles of articles that Dr. Mash has not herself read; Mash Depo., pp. 203, 277, Ex. "A";

- correspondence to the FDA from Dr. Anthony Kales marked as Deposition Exhibit 25; Mash Depo., p. 188, Ex. "A"; and

- European post-marketing surveillance reports; Mash Depo., p. 133, Ex "A".

### Dr. Mash's Admissions On
### Scientific Validity of Her Methodology

3.   Dr. Mash testified that cause and effect is not the issue addressed by her methodology.

> Q.   Have you ever heard a speaker, a presenter, a question from the floor at any medical meeting or scientific meeting you ever attended where the speaker or presenter said, "It is scientifically valid to use Spontaneous Reporting System data and case reports and animal studies in mice and rats to come to cause and effect conclusions, that is, that a drug does cause a certain event in humans?  Ever heard anybody say that?
>
> A.   Who cares?
>
> Q.   I care.  Have you?
>
> A.   Cause and effect is not the issue.
>
> Q.   It is the issue in this case, ma'am.
>
> A.   No, it's not.

Mash Depo., pp. 219-220, Ex. "A".

4.   Dr. Mash testified that drug experience reports or SRS data cannot be used to come to a scientifically valid conclusion about whether a drug can cause an adverse effect.  Mash Depo., p. 122, Ex "A".

> Q:   Is it your testimony, Doctor, that Spontaneous Reporting System data can be used to come to a scientifically valid conclusion about cause and

> effect, that is whether taking a drug caused an event?

A:   No.

Q:   You think that that data cannot be so used, correct?

A:   Correct.

5.   Spontaneous reports (DERs) are sent to the FDA even if the reporter (e.g., the treating physician or dispensing pharmacist) believes that the event is not related to the drug. Mash Depo., p. 318, Ex. "A".

6.   Dr. Mash testified that the purpose of anecdotal case reports in the medical literature is to pose questions about possibilities or to raise potential problems; they are not used for cause and effect determinations. Mash Depo., pp. 124-25, Ex. "A"; See Affidavit of Anthony Rothschild, M.D., paragraph 6, attached as Exhibit "B".

7.   Dr. Mash testified that, because it is not a controlled clinical trial, the events observed in an anecdotal case report could be related to the drug in question, could be related to some other drug the person was taking, could be the result of an underlying disease or might just be due to chance. Mash Depo., p. 124, Ex. A; See Rothschild Affidavit, paragraph 6, Ex. "B".

8.   Dr. Mash testified that she has not actually read any animal studies on Halcion®, she has only read the citations to

such studies in a pharmacology text. Mash Depo., pp. 189, 286, Ex. "A".

9.    Dr. Mash testified that one step in attempting to extrapolate the results of animal studies to humans is to calculate the equivalent dose in humans in units of mg. of drug to kg. of body weight; Dr. Mash has not made any such calculations to extrapolate such studies to humans.   Mash Depo., pp. 287-88, Ex. "A".

10.   Dr. Mash testified that the correspondence from Public Citizen to the FDA is not scientific data and cannot be used to come to a cause and effect conclusion.   ("It's not scientific data contained therein; ergo, you cannot formulate a cause and effect relationship.")   Mash Depo., p. 129, Ex. "A".

11.   Dr. Mash has not read any of the original sources or backup documentation cited in the Public Citizen correspondence to the FDA.   Mash Depo., pp, 129-30, 133, 319, Ex. "A".

12.   Dr. Mash testified that her only knowledge of clinical trials on Halcion comes from "secondary citations" contained in Deposition Exhibit 25; she has not read or reviewed any Halcion® clinical trials.   Mash Depo., p. 190, Ex. "A".

13.   Dr. Mash testified that she had not read any of the original sources or backup documentation cited in the Dr. Anthony Kales' correspondence to the FDA, unless otherwise identified and marked during her deposition.   Mash Depo., pp, 187-88, 318, Ex. "A".

14.   Dr. Mash testified that European post-marketing surveillance reports are the same kind of spontaneous reports contained in the FDA's SRS.  Mash Depo., p. 134, Ex. "A".

15.   Dr. Mash testified that the most definitive way to arrive at a cause and effect conclusion is to conduct double-blind, controlled clinical trials or controlled epidemiology studies. Mash Depo., p. 125, Ex. A.  See Rothschild Affidavit, paragraph 12, attached as Ex. "B".

16.   Dr. Mash testified that a causal determination cannot be made without supporting data from controlled clinical trials.  (" . . . yes, I agree with you, that you cannot make causal determinations from - without doing a controlled clinical study, . . .").   Mash Depo., p. 131, Ex. "A".   See Rothschild Affidavit, paragraph 12, Ex. "B".

17.   Dr. Mash testified that the way to tell whether adverse events occur at an increased incidence with a drug is to do an epidemiology study with a defined population.   Mash Depo., p. 273, Ex. "A".

18.   Mash agrees that it is important in coming to a conclusion about causation to exclude all other possible causes. Mash Depo., pp. 334-35, Ex. "A".

19.   Dr. Mash testified that differential diagnosis is a valuable scientific methodology in which all causal possibilities are considered and eliminated, if possible, to arrive at a causal

conclusion.   Dr. Mash did not go through that process regarding plaintiff.  Mash Depo., pp. 135-136, Ex. "A".

20.   Dr. Mash testified that her methodology utilizing SRS data, case reports and animal data in rats and mice is "used to generate hypotheses pertaining to causality."  Mash Depo., p. 220, Ex. "A".

21.   Dr. Mash testified that, in the language of scientists, a hypothesis is a statement of possibility, answered only by gathering data.  Dy definition, a hypothesis is something not yet proven.  Mash Depo., p. 337, Ex. "A".

### Facts Regarding The Testing Of Dr. Mash's Methodology

22.   Dr. Mash admits that she has never tested the methodology underlying her causation opinion.  (". . . no, I haven't tested my opinions.")  Mash Depo., p. 214, Ex. "A".

23.   Dr. Mash has never conducted or designed a clinical study involving Halcion or any benzodiazepine, the class of drugs to which Halcion belongs.  Mash Depo., pp. 38-39, Ex. "A".

24.   Dr. Mash has never been involved in any original research involving the administration of Halcion to human beings. Mash Depo., pp. 31, 34, Ex. "A".

25.   Dr. Mash has never performed any animal research regarding benzodiazepines or Halcion.   Mash Depo., pp. 33-34, Ex. "A".

26.   Dr. Mash has never been personally involved in any research involving Halcion or any sleep medication.  Mash Depo., pp. 38, 46, Ex. "A".

27.   Dr. Mash has never conducted any sleep disorder research.  Mash Depo., p. 38, Ex. "A".

28.   Dr. Mash has conducted no epidemiological research with Halcion or any benzodiazepine.  Mash Depo., pp. 34-35, Ex. "A".

29.   The totality of Dr. Mash's research regarding Halcion has involved the reading of abstracts or titles of articles written by others.  Mash Depo., p. 277, Ex. "A".

30.   Dr. Mash admits that, to the extent she relies on reports of animal studies, she has not performed any calculations to extrapolate results of animal studies to humans.  Mash Depo., p. 288, Ex. "A".

31.   Halcion has been studied in hundreds of controlled clinical studies involving over 10,000 Halcion patients.  Affidavit of Kenneth Starz, M.D., attached as Ex. "C".

32.   Dr. Mash cannot cite to any controlled clinical trial which shows a statistically significant association between taking Halcion and the behavioral and psychiatric events alleged by plaintiff:  hallucinations, aggression, paranoia, a g i t a t e d delirium, hostility, anxiety and suicidal behavior.  Mash Depo., pp. 89-91, 93-94, 268, Ex. "A".

33.  Halcion  has  been  studied  in  at  least  twelve structured epidemiological studies involving over 89,000 Halcion patients.   Affidavit  of  Anthony  Rothschild,  M.D.,  attached  as Ex. "B".

34.  Dr.   Mash   cannot   cite   to   any   structured epidemiological study looking at a defined population which shows a statistically significant association between taking Halcion and the  behavioral  and  psychiatric  events  alleged  by  plaintiff: hallucinations, aggression, paranoia, agitated delirium, hostility, anxiety or suicidal behavior.  Mash Depo., pp. 90, 92-94, 268, Ex. "A".

35.  Dr. Mash testified that the way to test whether Halcion causes events like those alleged by plaintiff is to conduct large scale epidemiological studies with defined populations and see  how  many  times  events  occur  in  people  taking  Halcion  and compare that to the incidence of the events in people taking other sleeping medications and in the general population.   Mash Depo., p. 216, Ex. "A".

36.  Dr. Mash has not reviewed any Halcion epidemiology study looking at large patient populations.  Mash Depo., p. 93, Ex. "A".

37.  Dr.  Mash  is  not  familiar  with  the  large  body  of epidemiological research that has been performed on Halcion:

> Q:   Is it your testimony that no one has gone out and done large scale epidemiology studies looking at a defined population to look at potential adverse events with Halcion?
>
> A:   Not to the extent of the psychiatric type of data set that we're talking about here, no, sir.
>
> Q:   At least you don't know of any?
>
> A:   Not that I know of, no, sir, no, sir.

Mash Depo., pp. 215-16, Ex. "A".

> \*     \*     \*
>
> A.   I don't know the epidemiological literature on this, . . .

Mash Depo., p. 161, Ex. "A".

38.   Dr. Mash has not read any research study on Halcion, whether published or unpublished, or any article on any Halcion epidemiological study.  Mash Depo., pp. 66-67, Ex. "A".

39.   Although Dr. Mash hypothesizes that a "cumulative kindling effect" is responsible for plaintiff's behavior on April 20, 1991, she can cite to no controlled clinical trial or epidemiological study which shows that Halcion creates a statistically significant risk of "cumulative kindling effect" resulting in behavior such as that exhibited by plaintiff on April 20, 1991.  Mash Depo., pp. 335-36, Ex. "A".

40.   Dr. Mash can cite no scientifically valid data which shows that people taking Halcion have any different incidence (frequency of occurrence) for the behaviors and symptoms alleged by

plaintiff compared to the general population. Mash Depo., pp. 257-59, Ex. "A".

41.   The New Drug Application (NDA) for Halcion is a compilation of all of the clinical and other data gathered regarding Halcion and submitted to the FDA.  Dr. Mash has not read or reviewed the NDA for Halcion.  Mash Depo., p. 69, Ex. "A".

42.   Dr. Mash does not know how many controlled clinical trials or epidemiological studies have been done on Halcion or how many patients taking Halcion have been studied in these structured studies.  Mash Depo., pp. 70-71, Ex. "A".

43.   Dr. Mash admits that, if there are a considerable number of epidemiological studies looking at the incidence of adverse events in people taking Halcion and in people taking other medications, her causation opinion is based on incomplete information.   She admits that she would have to consider that information regarding causality. Mash Depo., pp. 274-275, Ex. "A".

**Facts Regarding General Acceptance In The**
**Scientific Community of Dr. Mash's Causation Methodology**

44.   Dr. Mash admits that the generally accepted view of the scientific community is that her methodology can be used to generate scientific hypotheses, but cannot be used to generate cause and effect conclusions. Mash Depo., pp. 222-23, Ex. "A"; see Rothschild Affidavit, paragraphs 3, 7-11, Ex. "B".

45.   Dr. Mash has never heard a speaker or presenter at any scientific, medical or pharmacology meeting state to an assembled group of peers that it is scientifically valid to use her methodology (SRS data, case reports and animal studies) to reach cause and effect conclusions.  Mash Depo., p. 220, Ex. "A".

46.   Dr. Mash does not know of any author in any peer reviewed journal who has ever stated that a cause and effect relationship has been established between the ingestion of Halcion and any of the psychiatric or behavioral effects alleged by plaintiff.  Mash Depo., pp. 217-19, Ex. "A".

47.   The generally accepted view of the scientific community is that spontaneous reports are not capable of being used to scientifically establish incidence rates, reliable estimates of relationships, or a causal relationship between a medical event and drug.   Rothschild Affidavit, paragraphs 9-11, Ex. "B"; see also Faich G.A., "Adverse-Drug Reaction Monitoring", N. Eng. J. Med. 314(24):1589-1592 (1986), attached as Ex. "D"; Stang, P.E., Fox, J.L., "Adverse Drug Events and the Freedom of Information Act:  An Apple in Eden," Annals of Pharmacotherapy, 26:238-243 (1992), attached as Ex. "E".

48.   The FDA states that spontaneous reports or SRS data cannot be used to assess causal relationships or relative risks. FDA Caveat Sheet, Attachment 1 to Rothschild Affidavit, Ex. "B".

49.   The   World   Health   Organization   states   that spontaneous reports cannot be used to assess causal relationships or relative risks.   See Attachment 2 to Rothschild Affidavit, Ex. "B".

50.   Dr. Mash admits that the FDA will not accept a cause and effect conclusion unless data from controlled clinical trials demonstrate a statistically significant association between the drug and the outcome.   Mash Depo., pp. 153-54, Ex. A.

51.   The methodology which is generally accepted in the medical and scientific community to draw inferences of a possible causal relationship between a drug and a medical event is the performance of controlled clinical and epidemiological studies which are capable of determining (a) an incidence or frequency of occurrence rate of the event within a given population and (b) whether a statistically significant association exists between ingestion of the drug and the medical event.   This methodology has been subjected to peer review and published in numerous scientific journals.   This methodology has a known error rate.   This methodology is subject to exacting standards that control the technique's operation.   This methodology is generally accepted by the medical and scientific community as being the only methodology that can determine if a causal relationship exists between ingestion of a drug and the occurrence of an adverse medical event. Rothschild Affidavit, paragraph 12, Ex. "B".

52.   Dr. Mash testified that the professional reputation of Dr. Anthony Rothschild, author of the attached affidavit regarding the generally accepted methodology in the scientific community, is "stellar", a "very good reputation."   Mash Depo., pp. 42-43, Ex. A.

53.   Dr. Mash admits that the generally accepted view in the scientific community is that SRS data cannot be used to come to cause and effect conclusions.   Mash Depo., pp. 122-23, Ex. A; see Rothschild Affidavit, paragraphs 13, 15-16, Ex. "B".

54.   Dr. Mash admits that the generally accepted view in the scientific community is that anecdotal case reports (a) are not the equivalent of controlled clinical trials, (b) are useful in posing questions about whether a certain clinical trial or epidemiological study should be done, and (c) are not used to come to a cause and effect conclusion.   Mash Depo., pp. 124-25, Ex. "A".

55.   Dr. Mash admits that the generally accepted view among her scientific peers is that, to reach a scientifically valid determination of cause and effect between a drug and an event, one must look at the data from controlled clinical trials.   Mash Depo., p. 133, Ex. "A".

### Facts Regarding Peer Review Of Dr. Mash's Methodology

56.   Dr. Mash has never subjected her causation opinion regarding Halcion to any type of peer review:

> Q:  In any event, your opinion that Halcion causes suicidality, and aggressiveness, and paranoia, and agitated delusions, and hallucinations and so on, you've never subjected that to peer review in any kind of public forum, a journal or a meeting or anything like that?

> A:  No, Counselor.

Mash Depo., p. 160, Ex. "A".

57.  Dr. Mash has never published the methodology utilized in her causation opinion in a peer review journal.  Mash Depo., p. 216, Ex. "A".

58.  Dr. Mash has never written or communicated to FDA her theories relating to Halcion.  Mash Depo., pp. 27, 330, Ex. "A".

59.  Dr. Mash has never communicated her theories regarding Halcion to anyone at Upjohn.  Mash Depo., p. 27, Ex. "A".

60.  Dr. Mash has never expressed the view in a scientific symposium or forum that Halcion causes or is capable of causing the injuries plaintiff asserts.

> I already stated on the record that I haven't presented a paper, and I haven't attended anything, any meeting, and I haven't gone up to the microphone and posed any questions about any of the adverse events related to Halcion, about any effect of Halcion, good or bad.

Mash Depo., p. 159, Ex. "A".

### Facts Regarding The Rate Of Error Inherent
### In Dr. Mash's Methodology

61.   Dr. Mash bases her causation opinion, in large part, on drug experience reports submitted to the FDA's Spontaneous Reporting System (SRS).  Mash Depo., p. 200, Ex. "A".

62.   Spontaneous reports are collected in neither a controlled nor a randomized fashion.   Rothschild Affidavit, parargaph 14, Ex. "B".

63.   Because Dr. Mash bases her causation opinion on spontaneous reports and not controlled studies, her methodology has no known or quantifiable rate of error:

> Q:   But isn't it correct that at least as we sit here today, we really don't know how to calculate the error rate --
>
> A:   No, sir.
>
> Q:   -- for the use of spontaneous reporting of events?
>
> A:   There are major limitations, I would agree.

Mash Depo., pp. 224-25, Ex. "A".

64.   Dr. Mash admits that there is error in SRS data because reports are often incomplete and may or may not include critical information such as dose, concomitant medication, concomitant use of alcohol, and serious life events which may be significant stressors.  Mash Depo., p. 224, Ex. "A".  She further admits that there are major limitations in attempting to calculate the error rate in SRS data.  Mash Depo., pp. 224-25, Ex. "A".

65.   Dr. Mash admits that some, but not all of the events actually occurring are reported to the SRS; the proportion of those events which are reported is not known.   The events in the SRS represent an unknown percentage of all events occurring; the number of people taking any specific drug, e.g., Halcion, is also unknown. Mash Depo., pp. 120-121, Ex. "A".

66.   Dr. Mash recognizes limitations on the use of SRS data to arrive at cause and effect conclusions because the number of spontaneous reports are affected in an unknown and unquantifiable way by publicity in scientific and popular media, the length of the drug is on the market, differences in individual manufacturer's reporting practices and secular reporting trends (the observed tendency for the number of reports for all drugs to change over time).   Mash Depo., pp. 179-80, Ex. "A"; Rothschild Affidavit, paragraphs 2-16, Ex. "B".

67.   The quality of information submitted with any spontaneous report varies widely.   There are no controls or standards for submission because each reporter uses an individual, personal and unknown criteria for identifying which event will be reported.   Because no standards exist controlling the input of information with the SRS, it is not scientifically possible to extract valid conclusions about causality, incidence or comparative drug safety from the SRS.  Because of these limitations, it is not

possible to calculate a meaningful error rate for the SRS data. Rothschild Affidavit, paragraph 4, Ex. "B".

### Facts Regarding Factual Support For
### Dr. Mash's Methodology

68.   Dr. Mash admits that the mechanism by which Halcion, in her opinion, causes any of the behavioral effects plaintiff claims is unknown or "not completely understood."  Mash Depo., pp. 207-08, Ex. "A".

69.   Dr. Mash testified that her mechanism of action theory is a "working assumption."  Mash Depo., at p. 206, Ex. "A".

70.   Because Dr. Mash has not actually read any studies or examined any data regarding Halcion herself, she "assumes" that some data cited by others came from controlled clinical trials. Mash Depo., p. 315, Ex. "A".

71.   Dr. Mash admits that any calculation of incidence rates or relative risks from SRS data would require guesses or assumptions.  Mash Depo., pp. 121-22, Ex. "A".

72.   Because  Dr.  Mash  has  not  read  the  body  of epidemiological studies performed on Halcion, her testimony is that her causation opinion is based on incomplete information.   Mash Depo., pp. 274-75, Ex. "A".

73.  Possible  causes  for  plaintiff's  behavior  which Dr. Mash  has  not  considered  and  eliminated  in  a  differential diagnosis  include  any  psychiatric  diagnosis  or  disturbance  in

plaintiff, of which she is unaware, and the effects of alcohol. Mash Depo., p. 136, Ex. "A".

74.   Dr. Mash admits that alcohol intoxication can result in aggressiveness, impaired judgment, impaired attention, irritability, emotional liability or mood swings, slurred speech, incoordination, unsteady gait, disinhibition, hyperactivity, blackout or loss of memory, confusional state, incoherence and increased risk of violent behavior.   Dr. Mash admits that plaintiff's behavior on April 20, 1991 could have been produced by alcohol intoxication, and that all of his symptoms can be related to alcohol intoxication.   Mash Depo., pp. 232-234, Ex. "A".

75.   In the court proceeding regarding the dependency of plaintiff's children, plaintiff admitted that he consumed seven (7) beers on April 20, 1991 prior to striking his son four times on the head with a radio and holding a knife to the throat of his domestic partner Joanne Read.   Order of Adjudication of Dependency and Deposition, July 9, 1991, attached as Ex. "F".   During the court-ordered substance abuse evaluation, plaintiff admitted that he drank eight or nine (8 or 9) beers on April 20, 1991.   Records of Comprehensive Alcoholism Rehabilitation Program, Inc., July 29, 1991, attached as Ex. "G".

76.   Dr. Mash is unaware of any psychiatric diagnosis or disturbance in plaintiff.   This would be a possible cause for plaintiff's behavior on April 20, 1991 that one would want to

consider and rule out in a differential diagnosis.  Dr. Mash has not reviewed any psychiatric or psychological evaluation of plaintiff.  Mash Depo., pp. 136, 234, Ex. "A".

77.  Dr. Mash has not met or examined or evaluated Plaintiff.  Mash Depo., p. 20, Ex. "A".

78.  Dr. Mash's knowledge of plaintiff's current psychological status is what plaintiff's attorney has told her. Mash Depo., p. 193, Ex. "A".   If plaintiff had borderline personality disorder or traits, that could have contributed to cause his April 20, 1991 behavior.  Mash Depo., p. 236, Ex. A.

79.  Plaintiff underwent two court-ordered psychological evaluations.  On July 25, 1991, Cheri Prohaska, Psy.D., a clinical psychologist with Juvenile and Family Court, Palm Beach County, evaluated plaintiff and concluded that he tends to be rigid, uncompromising and egocentric.  Because he maintains strict control over his emotional expression, he is likely on occasion to become overwhelmed and express his anger in an explosive manner.   Such outbursts are unpredictable and likely to occur with little or no provocation.  Psychological Evaluation, August 30, 1991, attached as Exhibit H.  Dr. Prohaska repeated the evaluation on April 27-28, 1993 and concluded that plaintiff was at that time at risk for engaging in occasional unpredictable, unmodulated and exaggerated aggressive outbursts.   Psychological Evaluation, June 1, 1993, attached as Ex. "I".

80.   Plaintiff underwent a third psychological evaluation on April 21 and May 10, 1993 by Susan Hession, a master's degree level psychologist, at the request of plaintiff's attorney in the child dependency proceeding.  Ms. Hession diagnosed plaintiff with borderline personality disorder, a pervasive pattern of instability of mood, relationships and self-image.  She specifically noted in plaintiff diagnostic criteria of unstable and intense interpersonal relationships, shifts in mood, inappropriate intense anger with lack of control, frequent display of temper, aggressiveness and violence.    Testimony of Susan Hession, pp. 781, 785, 788-93, attached as Ex. "J".

81.   Dr. Mash testified that she is unaware of, and therefore did not take into account, any pattern of prior violence and physically abusive behavior by plaintiff, unaware that plaintiff had ever physically assaulted another person before April 20, 1991, unaware of plaintiff threatening another person holding a knife to his/her neck and unaware of any evidence of black eyes and bruises on plaintiff's domestic partner prior to April 20, 1991.  Dr. Mash further testified that evidence of these facts would be significant to her opinion.   Mash Depo., pp. 99, 137-39, 141, Ex. "A".

82.   The sworn deposition testimony, taken in this case, catalogs   a   long   history   of   prior   violence   by   plaintiff, particularly  when  drinking  alcohol,  against  each  of  his  prior

domestic partners, including chasing Joanne Read with a metal pipe and a knife, threatening both Joanne Read and Paula Haggerty with a knife to her throat, beating both with closed fist to the face and head causing black eyes, bleeding nose, large bruises, broken nose and cut and swollen lip and choking Joanne Read to unconsciousness. Such testimony includes plaintiff throwing a portable television set at Joanne Read and striking one child on the head with enough force to make the child stagger. Depositions of Debra Newell, pp. 31, 73,; Robert Critchley, pp. 20, 30, 35; Robin Beard, pp. 9, 17, 20, 88; Paula Haggerty, pp. 18, 46, 68-70, 74-75, 89; Kim Critchley, pp. 16, 29, 30-31; Joanne Read, pp. 70, 75, 79, attached as Ex. "K".

83. Dr. Mash testified that taking Halcion "led to the sequence of events that made [plaintiff] lose his children." Dr. Mash admitted, however, that she has not read the court transcript of the child dependency proceeding or the court's order which terminated plaintiff's parental rights. Mash Depo., pp. 150-52, Ex. "A".

84. Dr. Mash testified that she prepared Deposition Exhibit 11 together with plaintiff's counsel and that it sets forth the substance of the facts and opinions on which she proposes to testify. Deposition Exhibit 11 states that Halcion creates "increased risk" for some events and has a "high incidence rate" for other events. At her deposition, Dr. Mash admitted that she

CASE NO.   95-8308-CIV-MORENO
Page 23

had not calculated any "increased risk" values and refused to calculate any "increased risk" values at the deposition.   Mash Depo., pp. 246-49, Ex. A; Deposition Exhibit 11, attached as Ex. "L".  Dr. Mash further testified that she did not and does not have any figures for "high incidence rates" as reflected in Exhibit 11. Mash Depo., pp. 254-55, Ex. "A".

### Facts Regarding Dr. Mash's Qualifications

85.   Dr. Mash is not a medical doctor.   Mash Depo., p. 43, Ex. "A".

86.   Dr. Mash is not board certified in any specialty or subspecialty.   Mash Depo., p. 55, Ex. "A".

87.   Dr. Mash is not authorized to and does not diagnose or treat disease in humans.  Dr. Mash is not authorized to diagnose or treat patients with psychiatric illnesses.  Mash Depo., pp. 50, 56-57, 84-85, Ex. "A".

88.   Dr. Mash has never presented a paper, or given a speech or lecture, regarding Halcion or benzodiazepines.   Mash Depo., p. 57, Ex. "A".

89.   Dr. Mash is not licensed to prescribe medication in any state and has never prescribed any medication for any human being.  Dr. Mash has never made the risk/benefit analysis necessary to a decision to actually prescribe medication to any human being. Mash Depo., pp. 44, 327-28, Ex. "A".

90.   Dr. Mash has no professional license in any field. Mash Depo., p. 63, Ex. "A".

91.   Dr. Mash is not a psychologist and does not do psychological evaluations of human beings. Mash Depo., pp. 238-39, Ex. "A".

92.   The focus of Dr. Mash's career has been basic science and "bench research", which does not involve the study of living human beings.   Mash Depo., pp. 32, 36, Ex. "A".

93.   Before this case, Dr. Mash had performed no research on Halcion.   She has done no animal study with Halcion or any benzodiazepine.   She has never taken part in any study, either clinical trial or epidemiological study, in which Halcion or any benzodiazepine was taken by human beings.   Mash Depo., pp. 34-35, 46, 192, Ex. "A".

94.   Dr. Mash testified that a large part of her research has involved the molecular aspects of pharmacology.   Dr. Mash was unable to draw or diagram the Halcion molecule when asked at her deposition.   Mash Depo., pp. 52, 115, Ex. "A".

95.   Dr. Mash has performed no research regarding sleep disorders or sleeping medications of any type.   Mash Depo., p. 39, Ex. "A".

96.   Dr. Mash could not name the benzodiazepine sleeping medications on the market at the time Halcion was prescribed for plaintiff.   Mash Depo., p. 75, Ex. "A".

97.   Dr. Mash testified that Halcion behaves differently from other benzodiazepines regarding "in vivo targeting", that it may have a "predilection for certain limbic system targets", and that there "might be" other secondary effects different for Halcion as compared to other benzodiazepines.  She admitted, however, that she has not reviewed any such data, that she "suspects" there may be such data but doesn't know of any, and that she could cite to no such data.  Mash Depo., pp. 47-51, Ex. "A".

98.   Dr. Mash has no training in psychiatry and does not do psychiatric evaluations of human beings.  If she was presented with a patient who had a psychiatric illness or was experiencing a psychiatric event, she would call a psychiatrist to manage the patient.  Mash Depo., pp. 60, 64, 239, Ex. "A".

99.   In her causation opinion, Dr. Mash described plaintiff's alleged Halcion-induced behavior on April 20, 1991 as "agitated delirium".  At her deposition, she admitted that agitated delirium is a psychiatric diagnosis, and she was unable to identify the diagnostic criteria for that psychiatric illness.  Mash Depo., p. 115, Ex. "A".

100. Dr.  Mash  testified  that  it  was  possible  to "extrapolate" that plaintiff was suffering from depersonalization. She admitted that, because she was not a psychiatrist, she was not qualified to diagnose or treat a patient with depersonalization. Mash Depo., pp. 255-56, Ex. "A".

101. Dr. Mash has never evaluated, or participated in the evaluation, of a patient who was taking Halcion at the time.  Mash Depo., p. 116, Ex. "A".

102. Dr. Mash has no publications which concern Halcion and none of her publications relate specifically to any issue in this case.  Mash Depo., pp. 115-116, Ex. "A".

103. Dr. Mash testified that her area of specialization is the neuropharmacology related to cocaine abuse and dependence, dementia and Parkinson's disease.  She admits that the clinical and behavioral effects of benzodiazepines, including Halcion, is not her area of specialization.  Mash Depo., pp. 337-38, Ex. "A".

104. Dr. Mash testified that she did a computer "Medline" search for medical literature  regarding benzodiazepines and alcohol.  She admitted, however, that she has not actually obtained copies of such articles and that she has not read them.   Mash Depo., pp. 17-18, Ex. "A".

### Facts Regarding Any Specialized Literature In Support Of Dr. Mash's Methodology On Causation

105. Dr. Mash admits that she knows of no medical or pharmacology textbook which states that it is scientifically valid to use her methodology (SRS data, case reports and animal data in mice and rats) to come to cause and effect conclusions about whether a drug causes a certain effect in humans.  Mash Depo., p. 222, Ex. "A".

CASE NO.   95-8308-CIV-MORENO
Page 27

### Facts Regarding Dr. Mash's Non-Litigation
### Use Of Her Methodology

106. Prior to her involvement in this lawsuit, Dr. Mash had never used SRS data to come to cause and effect conclusions. Mash Depo., p. 123, Ex. "A".

107. Prior to her involvement in this lawsuit, Dr. Mash had never relied upon correspondence to the FDA from the "public interest" group Public Citizen to come to cause and effect conclusions.   Mash Depo., p. 128, Ex. "A".

108. Dr. Mash has utilized the methodology employed in this case "to formulate hypotheses" but has not utilized the methodology outside this case to formulate a cause and effect conclusion.   Mash Depo., pp. 227-28, Ex. "A".

109. Dr. Mash has never utilized methodology using SRS data to come to cause and effect conclusions in any peer reviewed grant application.   Mash Depo., p. 230, Ex. "A".

### Facts Relating To The Relevance Or "Fit"
### Of Dr. Mash's Methodology And Causation Opinion

110. Dr. Mash testified that, to the best of her knowledge, large scale epidemiological studies on Halcion have not been done.   Mash Depo., pp. 215-216, Ex. "A".

111. Dr. Mash cannot cite any controlled clinical trial or epidemiological study on Halcion which demonstrates that Halcion ingestion creates a relative risk greater than 2.0 compared to placebo for any of the behavioral and psychiatric events which

plaintiff alleged were caused by Halcion.   Mash Depo., pp. 95-97,
Ex. "A".

WHEREFORE, in consideration of the above and for reasons
set forth in the accompanying Memorandum In Support Of Motion To
Exclude Medical Causation Opinion Testimony Of Deborah Mash, Ph.D.,
Upjohn respectfully requests that the Court enter its Order
excluding from evidence in this case the medical causation opinion
testimony of Deborah Mash, Ph.D., and for such other relief as the
Court may deem just and proper.

Respectfully submitted,

ANDREW SEE, ESQ.
PAUL D. SNYDER, ESQ.
ALEXANDER B. ROBB, ESQ.
SHOOK, HARDY & BACON L.L.P.
One Kansas City Place
1200 Main Street
Kansas City, Missouri  64105-2118
Telephone:  1-816-474-6550
Facsimile:  1-816-421-5547

and

ANDERSON, MOSS, SHEROUSE
  & PETROS, P.A.
25th Floor, New World Tower
100 North Biscayne Boulevard
Miami, Florida 33132
Telephone:  1-305-358-5171
Facsimile:  1-305-358-7470

By: _____
       Thomas Sherouse, Esq.
       Florida Bar No.: 221295

       Co-Counsel for DEFENDANT
       THE UPJOHN COMPANY

CASE NO.   95-8308-CIV-MORENO
Page 29

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the attached **MOTION IN LIMINE TO EXCLUDE OPINION TESTIMONY OF DEBORAH MASH, PH.D.**, was served this _____ day of June, 1996, upon the following by United States mail, first class, postage prepaid:

James M. McCann, Jr., Esq.
AKERMAN, SENTERFITT & EIDSON, P.A.
Phillips Point - East Tower
777 South Flagler Drive, Suite 900
West Palm Beach, Florida   33401

Thomas Sherouse, Esq.
Attorney for Defendant

G:\CASES\CASE3\4644\DISC\11244845