

FILED by _____ D.C.
JUL - 1 1996
CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MICHAEL A. HAGGERTY,　　　　　　　　　CASE NO. 95-8308-CIV-MORENO

　　　　Plaintiff,　　　　　　　　　　　　　　MAGISTRATE JUDGE
vs.　　　　　　　　　　　　　　　　　　　　WILLIAM C. TURNOFF

THE UPJOHN COMPANY,　　　　　　　　**PLAINTIFF'S MEMORANDUM OF LAW
　　　　　　　　　　　　　　　　　　　　IN OPPOSITION TO UPJOHN'S
　　　　Defendant.　　　　　　　　　　MOTION IN LIMINE TO EXCLUDE
　　　　　　　　　　　　　　　　　　　　OPINION TESTIMONY OF
_____/　　　　DR. DEBORAH MASH, Ph.D.**

　　　　Plaintiff, Michael A. Haggerty (hereinafter "Haggerty"), by and through his undersigned attorneys, hereby files this response to the Motion in Limine to Exclude Medical Causation Opinion Testimony of Dr. Deborah Mash, Ph.D., filed by Defendant, The Upjohn Company, (hereinafter "Upjohn") and Upjohn's Memorandum in Support of the Motion in Limine.  In violation of Local Rule 7.1C(2) limiting argument to 20 pages, Upjohn filed a 50 page motion and memorandum re-hashing its cross-examination of Dr. Mash in her deposition which extended over three (3) separate days.  Rather than attempt to reply item by item to the 50 pages of misstatements and mischaracterizations of Dr. Mash's testimony, Haggerty submits that the issue in the present case is whether Dr. Mash's opinions meets the standard of scientific reliability to permit its introduction under the United States Supreme Court case of Daubert v. Merrill Dow Pharmaceuticals, Inc., 113 S.Ct. 2786, 509 U.S. 579, at 125 L.Ed. 2d 469 (1993).  Contrary to the implications of Upjohn's Motion and Memorandum, there is no requirement in Daubert that an expert witness must be able to testify to an opinion to a certainty.  In fact, the Daubert court specifically stated:

> Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably there are no certainties in science.

\* \* \*

> But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation - i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability. Daubert, Id., 113 S.Ct. at 2795.

A trial judge must determine whether the expert is proposing to testify to "scientific knowledge" that will assist the trier of fact to understand and determine the facts in issue. Daubert states that such a decision entails "a preliminary assessment of whether the reasoning of methodology underlining the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, Id. at 113 S.Ct. 2796. The Court then recites a few of the many factors that would bear upon such inquiry, not presuming to set forth a definitive checklist, but rather making some "general observations." The first general observation is whether the scientific knowledge can be or has been tested, a second is whether the theory or technique has been subject to peer review and publication; a third is whether the court should consider the known or potential rate of error; and the fourth is the previously accepted test of "general acceptance in the scientific community."[1] The court emphasized that the inquiry envisioned by Rule 702 is a flexible one and its subject is the scientific validity of the principles that underlay a proposed submission. The court specifically stated that "the focus, of course, must be solely on principles and methodology and not on the conclusions that they generate." 113 S.Ct. 2797.

Perhaps the best understanding the Daubert decision is to look at the facts and actual holding in the Daubert case. In Daubert, two minor children and their parents bought an action against Merrill Dow Pharmaceuticals, Inc., the manufacturer of the drug, Bendectin, a prescription drug marketed to prevent morning sickness in pregnant mothers. The plaintiffs claimed that the prescription drug caused serious birth defects in the children. The District Court

---

[1] The Eleventh Circuit has noted that, "These factors are neither exhaustive nor applicable in every case." Joiner v. General Electric Co., 78 F.3d 524 (1996).

granted the drug company's motion for summary judgment based upon an expert's affidavit concluding that in over 30 published studies involving over 130,000 patients, no study has found Bendectin to be a human Terotogen, a substance capable of causing malformations in fetuses. The plaintiffs responded to the drug company's affidavit by submitting affidavits of experts who concluded that Bendectin can cause birth defects. The Plaintiff's experts relied upon test tube and animal studies that found a link between Bendectin and malformations, studies of the chemical structure of Bendectin that showed similarities between the structure of the drug and that of other substances known to cause birth defects, and a "re-analysis" of previously published statistical studies. The two plaintiff experts specifically discussed in the Supreme Court opinion were a Ph.D. in statistics and a Ph.D. in chemistry.

The District Court's summary judgment was affirmed by the Ninth Circuit Court of Appeals. The United States Supreme Court reversed the Ninth Circuit's opinion, finding that scientific evidence may be admissible based upon the criteria stated even though such scientific evidence was not sufficiently established to have gained "general acceptance" in the field to which it belongs. The court recognized in Daubert the difference between the quest for truth in the courtroom and the quest for truth in the laboratory, by stating: "Scientific conclusions are subject to perpetual revisions. Law, on the other hand, must resolve disputes finally and quickly." 113 S.Ct. 2798.

The Eleventh Circuit recently analyzed Daubert in its review of a District Court's exclusion of expert testimony in Joiner v. General Electric Co., 78 F.3d 524 (11th Cir. 1996). There, the Court noted that in considering the admissibility of expert testimony, "The district court's focus is a narrow one and does not encompass deciding which expert's conclusions are better reasoned or more appealing." Id. at 532. The Court cautioned not to make scientific judgments on the basis of individual studies and noted that "the fact that there are a limited number of studies does not undermine the utility of those studies in assisting an expert to form an opinion." Id.

Haggerty submits that the opinions of Dr. Mash are consistent with the requirements of the <u>Daubert</u> decision. The methodology followed by Dr. Mash is stronger than the methodology followed by the Plaintiff's experts in <u>Daubert</u>, and the methodology followed by Dr. Mash is consistent with the methodology followed by the Food and Drug Administration in their most recent Task Force review of Halcion, and the historic methodology employed by Upjohn and the FDA in the review and approval of dosages, packaging, labeling and warnings of Halcion over the past 20 years.

Dr. Mash's methodology was created of necessity, due to the absence of current, reliable clinical studies on the safety of Halcion, specifically the incidence of psychotic adverse reactions to Halcion after long-term use. Mash's Deposition pages 158, 206, 216, 324. (All cited pages of Dr. Mash's deposition are attached under Exhibit "A"). Dr. Mash turned to the information available to her to formulate her opinions.[2] Such available information included:

  a) Published clinical studies; Mash Deposition pages 301-302.

  b) Published epidemiological studies; Mash Deposition pages 301-302.

  c) Clinical case study reports; Mash Deposition pages 200, 228, 301.

  d) Animal studies; Mash Deposition pages 189, 201, 204, 222-223, 314-315.

  e) Medical textbooks; Mash Deposition pages 189-190, 204.

  f) Adverse reaction reports; Mash Deposition pages 118, 177-178, 199-200, 217-218.

  g) Chemical characteristics and propensities of Halcion, similar drugs, and their effects upon the central nervous system; Mash Deposition pages 46, 48, 49-50, 201-204, 208-209, 288-290, 335-336.

  h) Studies and abstracts by other experts in the field, specifically the studies undertaken by Dr. Kales of the University of Pennsylvania (Mash Deposition pages 300-301),

---

[2] Substantial information was not available to Dr. Mash due to Upjohn's refusal to produce any documents without Plaintiff's agreement to an overbroad protective order. Plaintiff has refused to agree and Upjohn has finally brought this issue to this Court. Such information was available to the FDA and, of course, to Upjohn.

the study undertaken by FDA investigators Wysowki and Barash (Mash Deposition pages 177), and the Public Citizens Research Group's petition for the withdrawal of Halcion (Mash Deposition pages 202-203).

    i)    Dr. Mash's own professional experience and studies of the effects of drugs upon the central nervous system and aggressive behavior; Mash Deposition pages 45, 61-62, 159.

<u>Absence of Current Reliable Clinical Studies on the Safety of Halcion</u>:

Unlike the <u>Daubert</u> case, the facts of the present case do not present numerous wide spread published studies involving the safety of the product in question. In fact, the dearth of public or confidential studies has recently led the Task Force appointed by the FDA in its report issued on May 29, 1996 to specifically call for further studies of Halcion safety. A full copy of the Report is attached hereto as **Exhibit "B."** At page 39, the Task Force notes that studies to provide scientific evidence for Halcion's safety and adverse events have generally not been performed. Instead, Upjohn and others have relied upon observational approaches to compare adverse event frequencies for Halcion to those arising from the use of other benzodiazephines and placebos. The report went on to state "more than two decades after the Halcion new drug application was submitted by Upjohn to the FDA, issues associated with this safety and efficacy continue to challenge the Agency, the sponsor [Upjohn], and the public."

The FDA Task Force conducted a review of two of the confidential clinical studies that were performed and found that the information in the technical reports were not always accurately and completely collected and summarized and that Upjohn's oversight of the clinical trials was poor, and that the collection and summarization of the data as well as the conduct of these studies may have been below acceptable scientific norms of the time. Report, page 59-60. Dr. Mash noted in her deposition on numerous occasions that there was a lack of reliable clinical studies and certainly a lack of published clinical studies relating to the safety of Halcion with regards to its adverse reactions. A few days after Mash's deposition, the same conclusion was reached by the FDA Task Force consisting of nine scientists from the FDA whose work took place over two years. Both Dr. Mash and the Task Force specifically stated the opinion that

Upjohn should sponsor research that specifically studied adverse reactions from the long-term use of Halcion.

In the absence of such current reliable clinical studies, which Dr. Mash referred to as the "gold standard" in the scientific community, to establish the existence of the "cause and effect relationship" to a scientific certainty, Dr. Mash turned to the other sources of available information to form and test her opinions. In doing so, Dr. Mash followed the guidelines and procedures recommended by the Daubert court and those guidelines and recommendations followed by the FDA Task Force and by Upjohn and the FDA in their actions in dealing with Halcion over the past 20 years.

    A.    Published Clinical Studies:  In the Daubert case, there is no indication that any clinical studies were available to support the opinions of the Plaintiff's experts.  Instead, in Daubert, the court specifically stated that there were more than 30 published studies involving over 130,000 patients which consistently supported the position of the defendant drug company. Despite such an abundance of evidence, the Supreme Court in Daubert overturned the district court's finding that opposing scientific evidence could not be introduced.  The lack of clinical studies on the safety of Halcion was discussed above and was a specific subject of the FDA's recent Task Force Report.  Nonetheless, some limited published clinical studies exist in the biomedical literature commenting on Halcion's safety.  The Task Force Report noted that many of these studies are anecdotal.  Only a small fraction meet the criteria of being (1) double blind, (2) placebo controlled, (3) oral triazolom dose, and (4) published after 1985.  The Task Force report includes abstracts from those few selected studies.  Report, at page 34-35.  Similarly, Dr. Mash referred to published clinical studies and abstracts of such clinical studies which appeared in a petition by Dr. Anthony Kales of the University of Pennsylvania School of Medicine.  The specific citations by Dr. Mash to the published clinical studies and her discussion of such studies are found at pages 301-302 of her deposition.

    B.    Published Epidemiological Studies.  In Daubert, the lower courts relied upon an expert affidavit filed on behalf of the drug company that specifically referred to published

- 6 -

epidemiological studies, which differ from controlled clinical studies, as support for their finding of a summary judgment in favor of the drug company. The F.D.A. Task Force Report does not specifically consider published epidemiological studies separate and apart from published clinical studies but rather refers only to "reports from biomedical literature." The Task Force critiqued the design and execution of Upjohn's large scale postmarking study [2100/0235] in that the study compared the two lowest doses of Halcion with the two highest doses of Temazepan and does not study either the highest dose of Halcion or the lowest dose of Temazepan. The Task Force also critiqued the study because the study was not placebo controlled and concluded that many of the critical safety questions related to the use of Halcion, whether the drug at doses of .25 or .5 mg. given over extended periods of time to adult or geriatric patients can cause unusual adverse events or patterns of behavior, remained unanswered by the Upjohn study. See Report at page 36. Dr. Mash specifically referred to epidemiology studies that she reviewed, by reviewing abstracts or summaries of such studies to support her opinion. At pages 301-302 of Mash's deposition. The conclusion of the FDA Task Force Report, issued after Dr. Mash's opinions, were that the clinical and epidemiology studies that were in existence were few and not sufficient to establish the safety of Halcion. Moreover, Daubert does not restrict expert testimony to opinions that are solely based on epidemiological data. *See e.g.*, <u>Benedi v. Mc Neil - P.P.C., Inc.</u>, 66 F.3d 1378, 1384 (4th Cir. 1995) (stating that "epidemiological studies are not necessarily required to prove causation, as long as the methodology employed by the expert in reaching his or her conclusion is sound").

The Eleventh Circuit has recognized that: "[A] cause-effect relationship may not be clearly established by...epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion to sound . . . products liability law does not preclude recovery until a 'statistically significant' number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies...." <u>Wells v. Ortho Pharmaceutical Corp.</u>, 788 F.2d

741, 745 (11th Cir. 1986) (citation omitted).  See also Bowers v. Northern Telecom, Inc., 905 F. Supp. 1004 (N.D. Fla. 1995).

      C.     Clinical Case Reports.  An important basis of Dr. Mash's opinions were the clinical case reports which were published in medical literature on the adverse reactions and bizarre behavior caused by Halcion.  Mash's Depo. at Page 200, 228, 301.  The Daubert decision does not specifically mention clinical case reports, but the recent FDA report spends considerable time discussing the effect of clinical case reports from Dr. Van Der Kroef, a psychiatrist in the Netherlands who initiated a series of reports in 1977 that Halcion could cause a "syndrome" characterized by severe central nervous system reaction, including psychosis, paradoxical reactions, excitement, and paranoia.  These early case reports reinforced the opinion of the FDA medical officer reviewing the Halcion new drug application that the 1.0 milligram dose of Halcion was too high.  Apparently, the clinical case reports filed by Dr. Van Der Kroef led to the delay of Halcion approval for as many as five years after the initial approval in 1977 by an FDA Advisory Committee and led to the ultimate approval of Halcion at a dosage of .5 milligrams rather than 1.0 milligrams as initially recommended.  See Report pages 9-11.  The Task Force concluded that the FDA and Upjohn reduction of the highest recommended approved dose from 1.0 milligrams to .5 milligrams in the period through 1977 and 1982 was a direct result of the clinical case reports from Dr. Van Der Kroef.

      Dr. Mash discusses her use of clinical case reports and other "correlative studies" in supporting her opinion at Pages 164 and Pages 312-316 of her deposition.  Dr. Mash defines "correlative studies" as studies that do not directly establish "cause and effect," which can only be established on a scientific basis to a scientific certainty by current, reliable, and widespread clinical studies, but rather studies that show or support a causal relationship between Halcion and the adverse reactions.  In this manner, Dr. Mash's statements are similar to the language in the Daubert case that there are "no certainties in science" but that scientists are committed to searching for new temporary theories to explain phenomena.  Likewise in the FDA Report, the Task Force looks through the history of Halcion and numerous other sources of information

including such unique information as the decline in Halcion prescriptions, changes in the prescription practices of physicians, changes in Upjohn's sales techniques and marketing, and the FDA's critiques of Upjohn's public communications regarding Halcion as a part of "other information" relied upon by the Task Force in its Report. Report Page 35.

    D.    <u>Animal Studies</u>. Dr. Mash discusses various published animal studies on several occasions in her deposition. See Mash Deposition at Pages 189, 201, 204, 222-223, 314-315. It is improper to find research unreliable solely because it uses animal subjects. <u>Joiner</u>, 78 F.3d at 532. In the <u>Daubert</u> decision, one of the basis for the Plaintiffs expert's reports were scientific studies performed upon animals. The Plaintiff's expert's conclusions "were based upon 'in vitro' (test tube) and 'in vivo' (live) animal studies that found a link between Bendectin and malformations." 113 S.Ct. at 2791. The FDA study does not specifically refer to animal studies in reaching its conclusions, it is not surprising that the FDA's requirement of studies to determine the extent of psychotic type adverse reactions such as paranoia, suicidal tendencies, mania, etc., would not be satisfied by animal studies.

    E.    <u>Medical Textbooks</u>. Dr. Mash also specifically cited to a particular medical textbook at pages 189-190 and 204 of her deposition. That same textbook was specifically cited to in the FDA Report of the Halcion Task Force at page 5, footnote 8, in support of the Task Force's statement that "benzodiazepines are known to cause both physiologic and psychologic dependence." Therefore, the citation to well-known medical textbooks as part of an overall methodology is accepted within the field.

    F.    <u>Adverse Reaction Reports</u>. Nothing has so excited Upjohn's counsel as Dr. Mash's reliance upon adverse reaction reports and summaries of adverse reaction reports. Such adverse reaction reports are submitted to the FDA, often by Upjohn but also by patients and doctors directly. Dr. Mash discusses the adverse reaction reports throughout her deposition, but principally at pages 118, 177-178, 199-200, and 217-218. Although adverse reaction reports are not, *per se*, discussed in the <u>Daubert</u> decision, there is considerable discussion in <u>Daubert</u> of the plaintiffs expert's "re-analysis" of previously published epidemiological (human statistical)

studies. The plaintiff's analysis was based upon re-calculations of data in previously published studies, which re-analysis supported the plaintiffs' position even though the published study in which the data was found did not establish a direct causal link between the drug and birth defects. Dr. Mash admits that a single adverse reaction report or multiple adverse reaction reports may not, in and of themselves, support a direct scientific cause and effect connection between Halcion and the adverse reactions reported. The use of adverse reactions reports in the present case, however, is based upon the strength and consistency of the adverse reaction reports for a lengthy period of time, and the actions taken by both the FDA and Upjohn based upon such adverse reaction reports.

The recent report of the Halcion Task Force warns that "for any given report, there is no certainty that the suspect drug caused the reaction." The Report goes on to comment that presentations by the staff of the FDA Division of Epidemiology and Surveillance in 1989 established that increased adverse events reporting rates for Halcion as compared to another sleeping pill, Temazepan, and established that the reporting rates were 45 times greater for the adverse events of amnesia, 16 times greater for psychosis (hallucinations, paranoid reaction, acute brain syndrome), 37 times greater for seizures, and 3.5 times greater for death. Report, page 15. The Report also commented on the extent to which the adverse reaction reports had led to action from Upjohn and the FDA throughout the period of the drug's approval, in terms of changes in dosage, length of use, labeling, and packaging. At page 62-63 of the Report, the Task Force commented that, although the FDA and Upjohn cited the limitations of the spontaneous reporting system to support the position that Halcion labeling need not be changed, the FDA and Upjohn appeared to respond immediately to similar information when it was supplied by other regulatory agencies. Specifically, the Task Force cited the Netherlands experience in 1977 which contributed to the FDA's decision not to approve the 1.0 mg. dose in the United States, the French post-marketing experience that supported the FDA's decision to reduce the Halcion dosage from .50 mg. to .25 mg. in 1987, and the United Kingdom's Medicines Control Agency decision in 1991 to suspend Halcion, which led to the re-labeling and re-packaging of the drug in

WPALM/42241_1.DOC

1992. Although the latter decision was also based upon the finding of the misreporting of data in Study 221, the Task Force believed that the banning of the drug in the United Kingdom was also based upon the United Kingdom's interpretation of the United States' spontaneous reporting data as discussed at the FDA's 1989 Advisory Committee meeting.

      G.    <u>Chemical Characteristics and Properties of Halcion and Its Effect Upon the Central Nervous System</u>. As a neuropharmacologist, Dr. Mash spent considerable time in her deposition describing the chemical characteristics and propensities of Halcion and its effect upon the central nervous system. See Deposition of Mash, pages 46, 48, 49-50, 201, 204, 208, 209, 288-290, 335-336. Included within this discussion was the opinion of Dr. Mash that the long-term use of Halcion had a unique chemical effect upon the central nervous system, which effect includes a "kindling" effect in which the build-up of the drug upon the central nervous system placed increased pressure upon the individual, ultimately leading to the type of psychotic adverse reactions and aggressive behavior as seen in the few long-term clinical studies of Halcion such as the revised results of Study 321. In the <u>Daubert</u> decision, the expert for the plaintiff also relied upon "pharmacological studies of the chemical structure of Bendectin that purportedly showed similarities between the structure of the drug and that of other substances known to cause birth defects." 113 S.Ct. 2786 at 2791. The Task Force Report also looked at the unique molecular structure of Halcion and its effect upon the central nervous system. See Report, pages 4-6. While not specifically using the terminology of Dr. Mash of a "kindling" effect, the FDA Report did indicate that the chemical make-up of Halcion and "continued dosing" with Halcion leads to an increase of adverse events such as daytime anxiety and memory loss. The Report concluded that it is likely that "certain characteristics of Halcion --- perhaps associated with its high receptor binding and its short half-life --- makes certain adverse event more likely." Report at page 38.

      H.    <u>Studies and Abstracts by Others in the Field</u>. Dr. Mash's deposition specifically mentions three (3) other studies and abstracts by others in the field. The letter of Dr. Anthony Kales to the FDA dated October 21, 1991 and Dr. Kales' petition to withdraw approval of

Halcion of the same date and the attachment and abstracts reported therein. Mash Deposition at page 300-301. Second, the publication of Wysowki and Barash dealing with their review of the adverse reaction reports and comparing Halcion to other sleeping pills. Dr. Mash's deposition, page 177. Third, the Public Citizens Research Group's petition to withdraw Halcion and the abstracts and studies cited therein. Dr. Mash's Deposition, pages 202-203. The reliance upon abstracts and studies done by others was specifically accepted in the Daubert decision where the plaintiff's experts performed a re-analysis upon the underlying research data of previously published studies. Also in the Task Force Report, the FDA depended upon reviews of abstracts and other studies, stating that: "From the beginning, the Task Force recognized that it would not be feasible to review all of the information available on Halcion over the drug's more than 25-year regulatory history." The Task Force attached abstractions of many of the relevant documents in the regulatory record and abstractions of various studies performed both at the time of approval and of studies performed during the marketing of the drug in the United States. Therefore, it appears that reliance upon the studies of others that are known in the field and the preparation and reliance upon abstracts of other studies and articles is the methodology is acknowledged and accepted throughout the medical community. In fact, Upjohn attached the affidavit of one of its experts in this case, Dr. Anthony Rothschild, who has published an article in which he compared the various studies and literature on Halcion, a study read by Dr. Mash and considered in rendering her opinion. Certainly, Dr. Rothschild's opinions are based, in part, upon his own work in reviewing the work and writings of others.

I.   Dr. Mash's Own Professional Experience and Studies with the Effect of Drugs Upon the Central Nervous System and Aggressive Behavior. Dr. Mash testified that she had over 20 years of professional experience and studies with the effect of drugs upon the central nervous system and aggressive behavior. Again, such discussion takes up much of her deposition but is highlighted at pages 45, 61-62 and 159 of her deposition. Similarly, in the Daubert case, the Supreme Court cited to the "impressive" credentials of Dr. Swan, a Ph.D. in statistics who was the Chief of the California Department of Health and Services and of

WPALM/42241_1.DOC

Dr. Newman, a Ph.D. in chemistry, who spent over 10 years studying the effect of chemicals upon limb development. Dr. Mash in her own right has spent over 20 years studying the effects of various drugs upon the central nervous system and the resultant effect of such drugs, such as cocaine, upon aggressive behavior. Dr. Mash has been recognized by various courts as an expert in violent and aggressive behavior caused by the effects of drugs upon the central nervous system and has been accepted by the courts as an expert on central nervous system medications. She stated that Halcion is one of many drugs that interacts with the central nervous system receptors and, as an expert on drug interaction with central nervous system receptors, she has studied benzodiazepines as a class and Halcion as a member of that drug class and its interaction upon central nervous system receptors. See pages 45-46 of Mash's Deposition.[3] As the Eleventh Circuit has recently noted, "[E]xtensive experience and specialized expertise... augment the reliability of...reasoning and methodology." Joiner, 78 F.3d at 532. The FDA's recent Report on Halcion concluded by stating "the Task Force observes that the debate over Halcion's safety and efficacy and the actions of Upjohn and the FDA involve complex scientific and regulatory issues about which reasonable people may differ." The Task Force went on to recommend that the FDA conduct a re-assessment of Halcion's safety and efficacy and that consultants should be chosen to include a "wide spectrum of scientific expertise." Study, page 65. Certainly, experts, such as Dr. Mash, on the effect of drugs upon the central nervous system are the type of consultants within the wide spectrum of scientific expertise that must reassess Halcion's safety and efficacy.

---

[3]   Upjohn attempts to criticize Dr. Mash's opinion based upon the fact that she is not a medical doctor. In Bowers v. Northern Telecom, Inc., the plaintiffs retained experts in the field of "ergonomics," defined as "the study of the mental and physical capacities of persons in relation to the demands made upon them by various kinds of work." Bowers v. Northern Telecom, Inc., 905 F.Supp. 1004, 1009 (N.D. Fla. 1995) (citing New Webster's Dictionary, 320 (1992)). The defendants claimed that plaintiff's experts were not qualified to render an opinion on causation, as neither expert was a medical doctor. The court, however, found that based on their knowledge, experience and training, the experts were qualified to offer opinions. The court added, "courts around the country have allowed non-physician to render opinions relevant to causation." Id. (citing Hopkins v. Dow Corning Corp., 33 F.3d 1116, 1124 (9th Cir. 1994) (toxicologist who was not a medical doctor could testify as to causal link between breast implant and disease from which plaintiff suffered); Conde v. Velsicol Chem. Corp., 804 F.Supp. 972, 986-89 (S.D. Ohio 1992) (even though non-physician toxicologist could not render specific diagnosis, his opinions were helpful in resolving causation issues), aff'd. 24 F.3d 809 (6th Cir. 1994)).

## CONCLUSION

In Daubert, the court commenced its discussion of scientific knowledge by re-stating the general rule found in Rule 702 that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, an expert may testify thereto. Daubert, at 113 S.Ct. 2795. The court went on to state that "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. Dr. Mash's opinions surely meet this standard when her opinion, voiced a few weeks and days before the release of the Report of the Halcion Task Force of the United States Food and Drug Administration, corresponds almost item for item with the work done by nine highly regarded scientists and experts of the FDA over a course of two years. Although the substance of Dr. Mash's opinions reached through her methodology are more negative on the safety and the labeling of Halcion than the FDA's opinions, the methodology used to reach those opinions is extremely similar to and in line with the methodology expressed by the Halcion Task Force. Surprisingly, the Halcion Task Force came up with no area outside the methodology of Dr. Mash even though it had much greater availability to FDA's confidential documents, Upjohn's documents, and considerable more people, staff, and a longer period of time to work than Dr. Mash.

Many of the results reached by the FDA Task Force and Dr. Mash are consistent. Specifically, current clinical safety studies to support the safety of Halcion with regard to central nervous system adverse reactions and bizarre events are clearly insufficient. The spontaneous reporting system of adverse reactions has played and should continue to play a significant role in pointing out the problems of adverse reactions caused by the long-term use of Halcion. The overall question of safety of Halcion remains substantially unanswered by the clinical studies performed by Upjohn or sponsored by Upjohn at the request of the FDA. Finally, the unique chemical characteristics of Halcion make adverse events, especially with long-term usage, much more likely.

WPALM/42241_1.DOC

The Task Force's ultimate conclusion that reasonable people may differ on Halcion's safety and efficacy means that the finder of fact in this case needs the opinions of Dr. Mash in deciding the jury issue on Halcion's safety, efficacy and warnings. Under the <u>Daubert</u> decision, Plaintiff submits that Dr. Mash's testimony should be deemed admissible and accepted by this Court. Clearly, the opinion will be the subject to intensive cross-examination, as it has already during Dr. Mash's deposition. As pointed out by the court in <u>Daubert</u>, "vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof" are the traditional and appropriate means of attacking expert testimony. <u>Daubert</u>, 113 S.Ct., at 2798. Plaintiff submits that Upjohn's Motion In Limine To Exclude Medical Causation Opinion of Testimony of Deborah Mash, Ph.D., should be denied.

> Respectfully submitted,
>
> AKERMAN, SENTERFITT & EIDSON, P.A.
> Attorneys for Plaintiff, Michael A. Haggerty
> Phillips Point - East Tower
> 777 South Flagler Drive, Suite 900
> West Palm Beach, Florida 33401
> 407/659-5990
>
> By: _____
> James M. McCann, Jr.
> Florida Bar No. 182545

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by U.S. Mail, postage prepaid, to all persons listed on the attached Service List this 26th day of June, 1996.

_____
James M. McCann, Jr.

## SERVICE LIST

Paul D. Snyder, Esquire
SHOOK, HARDY & BACON L.L.P.
One Kansas City Place
1200 Main Street
Kansas City, Missouri  64105-2118
816/474-6550


Thomas Sherouse, Esquire
ANDERSON, MOSS, SHEROUSE & PETROS
100 North Biscayne Boulevard, Suite 2500
Miami, Florida  33131
305/358-5171


James M. McCann, Jr., Esquire
AKERMAN, SENTERFITT & EIDSON, P.A.
Attorneys for Plaintiff
Phillips Point - East Tower
777 South Flagler Drive, Suite 900
West Palm Beach, Florida  33401
407/659-5990