IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

**NIGHT BOX FILED**

JUL 24 1996

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

CASE NO. 95-8308-CIV-MORENO

MAGISTRATE JUDGE
WILLIAM C. TURNOFF

MICHAEL A. HAGGERTY,

    Plaintiff,

vs.

THE UPJOHN COMPANY,

    Defendant.

_____/

**PLAINTIFF MICHAEL A. HAGGERTY'S RESPONSE AND INCORPORATED MEMORANDUM OF LAW TO DEFENDANT THE UPJOHN COMPANY'S MOTION FOR SUMMARY JUDGMENT BASED ON LACK OF EXPERT MEDICAL TESTIMONY FROM A MEDICAL DOCTOR**

    Plaintiff, Michael A. Haggerty (hereinafter "Haggerty"), through undersigned counsel, hereby files his Response to Defendant, The Upjohn Company's Motion for Summary Judgment Based on Lack of Expert Testimony from a Medical Doctor.  In support thereof, Haggerty states as follows:

**I.    INTRODUCTION**

    The Upjohn Company (hereinafter "Upjohn") bases its Motion for Summary Judgment on two arguments:  (1) only an M.D., medical doctor, is qualified to render a causation opinion in a products liability action involving a drug and since Dr. Deborah Mash, is a Ph.D. in neuropharmacology, no competent testimony supports Haggerty's case; and (2) that only a M.D., medical doctor, can testify as to the adequacy of warnings on a prescription drug, and since Dr. Deborah Mash is a neuropharmacologist, no competent testimony supports Haggerty on this issue.  Upjohn's argument is founded entirely upon the flawed premise, unsupported under Florida or Federal law, that only an M.D. can render an expert opinion on causation or adequacy of warnings in a prescription drug case.  In fact, Dr. Mash is a medical and scientific expert qualified to render such opinions, and Dr. Mash's opinions are confirmed by the opinions of Dr. Baron, a medical doctor, M.D., who was the prescribing and treating physician.  Upjohn's

Motion for Summary Judgment Based on Lack of Expert Medical Testimony from a Medical Doctor should be denied.

## II.   STATEMENT OF CONTESTED MATERIAL FACTS

Haggerty disputes the "uncontested" facts recited by Upjohn as follows:

1.    Haggerty was prescribed Halcion in late February, 1991 upon his admission to Palms West Hospital for a neck operation by Dr. David Baron. Haggerty was prescribed Halcion during his hospital stay and was given a prescription by Dr. Baron upon his discharge from the hospital to assist him in sleeping after neck surgery.

Haggerty was initially given a prescription of 30 Halcion, .25 mg., and advised to take one pill per night as needed. Haggerty took the first thirty pills over a period of March 5, 1991 to April 19, 1991, approximately 45 days. On April 19, 1991, Haggerty received a refill of the prescription from Dr. Baron for an additional 30 pills, .25 mg., with the same instructions.

Dr. Baron did not re-examine Haggerty at the time of the second prescription for Halcion. Throughout the period of time when Haggerty was taking Halcion, Dr. Baron prescribed various pain killers and muscle relaxers to be taken together with Halcion.

Haggerty suffered at least one experience of amnesia while taking Halcion from March 5, 1991 to April 19, 1991. During this episode, he was extremely rude and obnoxious to a neighbor, but later recalled nothing about the incident. His only knowledge of this incident was being told about the incident by his girlfriend, Joanne Read. See Haggerty deposition page 176-178 (cited portion's of Haggerty's deposition are attached hereto as Exhibit A). See Joanne Read, deposition page 189-190 (cited portions of Joanne Read's deposition are attached hereto as Exhibit B).

On April 20, 1991, Haggerty spent the afternoon by the swimming pool of his apartment complex. During that afternoon, Haggerty recalls drinking two beers. See Haggerty deposition, Exhibit A, page 161-162, 203. See Joanne Read deposition, Exhibit B, Page 188. At the end of the afternoon, at approximately 6:00 p.m., Haggerty went up to his apartment, told his girlfriend, Joanne Read, that he was tired and was going to take a pill and go to bed. He then proceeded to

his room, took a single Halcion pill, and went to sleep. Approximately one hour later, Joanne Read awoke Haggerty to tell him that she needed to go to the store. Haggerty awoke in a stupor, appeared to be like a zombie, and was unable to recognize family members. See Joanne Read deposition, Exhibit B, pages 107-109. What followed can only be described as extremely bizarre, aggressive, and psychotic behavior. Haggerty commenced drinking one beer after another in the apartment. Apparently throughout the course of the bizarre events, Haggerty continued to consume beer. See Brian J. Read deposition, page 120 (cited portions of Brian J. Read's deposition are attached hereto as Exhibit C). From 7:00 p.m. until 11:30 p.m., when Haggerty leaped from a second floor balcony breaking his back in the leap, Haggerty ran around his apartment totally nude, trashed his apartment turning all furniture and everything in the apartment upside-down, threw furniture and bird cages off of the screened-in porch onto the lawn below, physically assaulted a neighbor, brandished butcher knives at his girlfriend and children, made one child attempt to eat his dinner like a dog off of the table without a plate, physically assaulted one child with a portable radio, threw pills and other medications throughout the entire apartment, ran up and down the stairs of the apartment building, knocking on the doors of the apartment manager on at least three occasions, and publicly urinated in the walkway of the building in front of several of his neighbors. Throughout this time, Haggerty made little or no sense in terms of his speech or his actions, was unable to recognize his girlfriend when she was standing in front of him, and otherwise appeared to both his family and to neighbors as a man who was totally out of his mind.

    2.      When Halcion was prescribed by Dr. Baron for Haggerty, Dr. Baron gave Haggerty no specific warnings regarding the drug. Dr. Baron merely stated "Take this pill, it will help you sleep." Joanne Read deposition, Exhibit B, page 91. Dr. Baron does not recall discussing any specific warnings with Haggerty regarding Halcion. Dr. Baron stated that he saw nothing wrong, however, with someone drinking one or two beers or even as many as a six-pack of beer on a Saturday or Sunday afternoon and still taking Halcion as a sleeping aid. See Dr. Baron deposition, pages 72 to 74 (cited portions of Dr. Baron's deposition are attached hereto

as Exhibit D). At the time that Halcion was prescribed for Haggerty, the following warnings accompanied Halcion to Dr. Baron:

Duration of Use: "It is recommended that Halcion not be prescribed in quantities exceeding a one month supply."

Bizarre Behavior: "Specifically, some evidence, based on spontaneous marketing reports, suggests that confusion, bizarre or abnormal behavior, agitation, and hallucinations may also be dose related, but this evidence is inconclusive."

Use with Alcohol: "Because of its depressant CNS effects, patients receiving triazolam should be cautioned against engaging in hazardous occupations requiring complete mental alertness such as operating machinery or driving a motor vehicle. For the same reason patients should be cautioned about the concomitant ingestion of alcohol or other CNS depressant drugs during treatment with Halcion tablets (Triazolam)."

    3.    Haggerty admits that all treating experts witnesses and all retained expert witnesses were listed as required by Local Rule 16.1. A number of these treating and retained expert witnesses have been deposed. Dr. Deborah Mash rendered her deposition over a course of three days. Dr. David Baron gave his deposition over the course of an afternoon. Both Drs. Mash and Baron testified as to medical causation opinions and as to the adequacy of Halcion's labeling. Dr. Baron testified that, in his opinion, Halcion combined with alcohol ingested by Haggerty was the cause of Haggerty's bizarre behavior on April 20, 1991. See Dr. Baron deposition, Exhibit D, pages 90-91. In light of Baron's testimony that he saw no problem with an individual ingesting Halcion having one or two beers with dinner prior to ingesting Halcion, or with an individual drinking as much as a six-pack during an afternoon prior to ingesting Halcion, the clear inference to be drawn from Dr. Baron's testimony is that Haggerty's use of the Halcion

following the ingestion of two beers in the afternoon by the pool was clearly in accordance with Dr. Baron's understanding of the proper use of Halcion with respect to alcohol. In light of the factual testimony of Joanne Read's son, Brian J. Read, that Haggerty's increased use of alcohol occurred in the apartment while he was in the midst of the Halcion induced state of bizarre behavior, (see deposition of Brian Read, Exhibit C, page 120), the reasonable inference to be drawn by the jury is that Halcion caused the bizarre behavior which included the ingestion of alcohol, which fueled the already bizarre behavior commenced by the ingestion of Halcion.

Dr. Mash testified that the ingestion of the Halcion directly caused or substantially contributed to the bizarre behavior shown by Michael Haggerty on the evening of April 20, 1991. See deposition of Dr. Mash, pages 78-79 (cited portions of Dr. Mash's deposition are attached hereto as Exhibit E).

4.  Dr. Baron testified that he was aware of no adverse side-effects of Halcion at the time of his prescription of Halcion for Haggerty other than that a patient who was awakened immediately following Halcion ingestion may suffer amnesia for events that occur while he or she was awake. Dr. Baron deposition, Exhibit D, pages 70-72. Later, Baron discovered from lay press reports that Halcion had been banned in the United Kingdom due to the reports of bizarre reactions to Halcion. Following such widespread knowledge of Halcion's problems, Dr. Baron changed his use of Halcion to use only in the hospital and then only for a period of less than one week. Dr. Baron deposition, Exhibit D, pages 92-96. Dr. Baron began prescribing over the counter Benadryl as a long-term sleeping pill for patients such as Haggerty needing assistance with sleep. Dr. Baron deposition, Exhibit D, page 21.

Dr. Mash testified that in her opinion, the warnings given by Upjohn on Halcion to doctors and to the general public were grossly inadequate to advise doctors of the risk involved in prescribing Halcion for a period over one month, the risk of abnormal or bizarre behavior, agitation, and confusion, the risk of ingestion of Halcion with alcohol. Dr. Mash indicated that clear warnings needed to be given to doctors on the dangers of the long-term use of Halcion without reexamination or reevaluation of the patients, the risk of bizarre and abnormal behavior,

agitation and hallucinations, and the substantial danger of such abnormal and bizarre behavior when Halcion is ingested with alcohol. See Mash deposition, Exhibit E, pages 244-250. Although Dr. Mash did not specifically rewrite the warnings for the FDA and Upjohn, Dr. Mash did comment upon the much stronger warnings accompanying Halcion in effect at the present time and in effect since 1992. See Mash deposition, Exhibit E, pages 244-250; 253-257; 259-264. Such warnings currently are as follows:

<u>Duration of Use</u>: "Halcion is indicated for the short-term treatment of insomnia (Generally 7 to 10 days). Use for more than two-three weeks requires complete reevaluation of the patent (See warnings). Prescriptions for Halcion should be written for short-term use (7-10 days) and it should not be prescribed in quantities exceeding a one month supply."

<u>Warnings</u>: "Sleep disturbance may be the presenting manifestation of a physical and/or psychiatric disorder. Consequently, a decision to initiate symptomatic treatment of insomnia should only be made after the patient has been carefully evaluated, the failure of insomnia to remit after 7-10 days of treatment may indicate the presence of a primary psychiatric and/or medical illness."

<u>Abnormal Behavior</u>: "Warning - Worsening of insomnia or the emergence of new abnormalities of thinking or behavior may be the consequence of an unrecognized psychiatric or physical disorder. These have also been reported to occur in association with the use of Halcion.

A variety of abnormal thinking and behavior changes have been reported to occur in association with the use of benzodazophine hypnotics including Halcion. Some of these changes may be characterized by decreased inhibition, e.g., aggressiveness and extroversion that seem excessive, similar to that seen with alcohol in other CNS depressants (e.g. sedative/hypnotics). Other kinds of behavior or changes have also been reported, for example bizarre behavior,

agitation, hallucinations, depersonalization. In primarily depressed patients, the worsening of depression, including suicidal thinking has been reported in association with the use of Benzodazophines."

5. Susan L. Hession was deposed on May 15, 1996. Hession is a licensed mental health counselor with a Master's Degree in psychology. Hession conducted a series of interviews with Haggerty after the Halcion-induced event of April 20, 1991. Hession diagnosed Haggerty as having borderline personality disorder. She opined that Halcion exacerbated Haggerty's symptoms and that Halcion is contraindicated in individuals with psychiatric disorders. See deposition of Susan Hession, page 84 (cited portions of Hession's deposition are attached hereto as Exhibit F). She also stated that Halcion could have contributed to Haggerty's conduct of April 20, 1991. Hession deposition, Exhibit F, pages 84-85. She stated that the alcohol, borderline personality disorder, pain killers and other medication he might have been on in conjunction with the Halcion was clinically significant for Haggerty's behavior. Hession's opinion regarding Haggerty's personality disorder stemmed primarily from events that occurred on or <u>after</u> April 20, 1991. See Hession deposition, Exhibit F, page 90-96. Hession's opinions are thus relevant to causation.

6. Dr. Mash was deposed over three days. She related opinions that the sole cause or a substantial contributing cause, to Plaintiff's behavior on the night of April 20, 1991 was the ingestion of Halcion and rendered the opinion that the warnings accompanying Halcion at the time when Dr. Baron prescribed the drug to Mr. Haggerty were inadequate in that they failed to strongly warn a doctor, such as Dr. Baron, of the effects of the long-term use of Halcion and the risk of abnormal bizarre and aggressive behavior which may result from the long-term use of Halcion.

7. (1) Dr. Mash is not a medical doctor, M.D., but testified that she is a neuropharmacologist and an assistant professor at the University of Miami School of Medicine. A copy of Dr. Mash's curriculum vitae is attached hereto as Exhibit G. Dr. Mash is an expert on

central nervous system medications. See Dr. Mash deposition, Exhibit E, Page 46. She has testified in other lawsuits as an expert witness on the effect of drugs, pharmacologic interactions, and adequacy of warnings on drugs. Dr. Mash deposition, Exhibit E, pages 22-25.

(2) Although Dr. Mash has not prescribed medication, she has often consulted with doctors and families relating to prescriptions of medications for patients and has analyzed the risk/benefit ratio of medications and the effect of medications upon central nervous system and the human body. Dr. Mash deposition, Exhibit E, pages 44-45. In her role as a neuropharmacologist, she is often consulted regarding the safety and efficacy of medications.

(3) Dr. Mash is presently conducting Phase I clinical trials of a drug that is under application for FDA approval and she is familiar with the requirements for FDA approval, including labeling requirements and safety and efficacy requirements. Dr. Mash deposition, Exhibit E, page 36.

(4) Dr. Mash did not "admit to being incapable of drafting language." In fact, Dr. Mash stated that the warning by Upjohn to doctors were clearly inadequate and Dr. Mash suggested that much stronger, unequivocal language was required to warn doctors, such as Dr. Baron, of the known risks of Halcion. Dr. Mash, correctly, did not render an opinion as to what would be "exact" "adequate" language in the Halcion package insert. She stated that is a decision that can only be made by the pharmaceutical company and by the FDA based upon the full extent of knowledge of the company and the FDA, none of which information has ever been disclosed to Haggerty or Dr. Mash. Dr. Mash did clearly and unequivocally render her opinion that, based upon the public knowledge available and the knowledge that she had of the severe adverse reactions to Halcion, the warnings in 1991 which gave no limitation on the duration of use, gave no indication of reevaluation of a patient at any time, that any suggested confusion, bizarre or abnormal behavior, agitation and hallucinations was "inconclusive," and that use with alcohol was cautioned against only if operating machinery or driving a motor vehicle were clearly insufficient to warn of the very real and very substantial risks of severe psychotic adverse reactions to Halcion.

8.  Upjohn has failed and refused to produce any documents relating to the testing, approval process, warnings, or long-term use of Halcion. Requests for such documents have been delayed under Upjohn's claim for an overbroad protective order. Therefore, neither Haggerty nor Dr. Mash have had an opportunity to review the documents and clinical tests within Upjohn's sole possession. On May 29, 1996, however, the FDA rendered its Report of the FDA Task Force on Halcion. This Task Force completed a two year study and review of the Halcion approval process, with specific emphasis on a certain Study 321, in which Upjohn admits that it misreported psychotic adverse reactions. Study 321 was conducted in the manner which both Upjohn and Dr. Mash described as the "gold standard" of clinical testing, a double-blind, placebo controlled study. In addition, Study 321 was conducted in an Upjohn facility within a Michigan prison, which enabled complete observation and control of the patients on a 24 hour a day basis. Unlike most clinical studies where reports of psychotic events may be masked or hidden by the known amnesia effect of Halcion, Study 321 had, indeed, a "captive" population. The results of Study 321 are revealing and significant. So significant, in fact, that when the true results of Study 321 were brought to the attention of the health authorities in the United Kingdom, Halcion was banned from the market. When the true results of Study 321 were brought to the FDA by Upjohn, the FDA conducted a complete reexamination and reevaluation of Halcion, leading to the above described changes in the warnings on Halcion, the restrictions on the dosage and usage, and the repackaging of Halcion into "blister" packs, emphasizing that no more than one pill should be taken per day. Furthermore, warnings were included in the blister packs to the patients giving detailed warnings of the dangers of bizarre and abnormal behavior, suicide, amnesia, and other psychotic adverse reactions to Halcion. Since Halcion had previously been reviewed by the FDA, the key difference in 1991 was the revelation of the true results of Study 321. In the revised results of Study 321, 14 of 30 subjects reported psychotic adverse events on 1-0 mg. of Halcion, compared to 3 of 20 on a placebo. See Report, Appendix B-112, attached hereto as Exhibit H.) To determine if the misrepresentations of the results in Study 321 were not an abnormality, the FDA Task Force reviewed the results of two other studies conducted at

approximately the same time. In these studies, the FDA Task Force again found that Upjohn had serious deficiencies in the conduct and manner of reporting of the studies. In its conclusion, the FDA found that there was a substantial difference of opinion on the safety and efficacy of Halcion. The FDA Task Force stated:

The Task Force observes that the debate over Halcion's safety and efficacy and the actions of Upjohn and the FDA involve complex scientific and regulatory issues about which reasonable people may differ.

In her deposition, which was concluded on the same day as the Halcion Task Force Report was released and without any knowledge of the Halcion Task Force Report, Dr. Mash testified that she believed that the "jury was still out" on the FDA's opinion and the scientific community's opinion on the safety and efficacy of Halcion. Dr. Mash deposition, Exhibit E, pages 323, 324. Upjohn has had sold over a billion dollars of Halcion, a drug which the FDA still believes is open to serious question and debate as to its safety and efficacy. The FDA Task Force Report also noted that substantially no safety studies on adverse events have been conducted by Upjohn on Halcion in the past 20 years.

### III. STANDARD FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be entered only when there is <u>no</u> genuine issue of material fact. All reasonable doubts about the facts are to be resolved in favor of the non-movant. <u>Rollins v. TechSouth, Inc.</u>, 833 F.2d 1525, 1528 (11th Cir. 1987); <u>Casey Enterprises v. Am. Hardware Mutual Ins. Co.</u>, 655 F.2d 598, 602 (5th Cir. 1981).

### IV. THE RECORD DEMONSTRATES THAT GENUINE ISSUES OF MATERIAL FACT EXIST REGARDING CAUSATION AND ADEQUACY OF WARNINGS

A. <u>Causation</u>:

Upjohn argues that Haggerty must present expert testimony from a medical doctor to prove medical causation. In its Motion, Upjohn asserts that Florida law requires that an expert rendering medical causation opinions be a medical doctor. The case cited by Upjohn in support

is Upjohn v. MacMurdo, 562 So. 2d 680 (Fla. 1990). In contrast to Upjohn's assertion that a medical doctor is required, the MacMurdo case simply discusses "expert testimony." In the context of the adequacy warnings directed toward a physician based upon the learned intermediary doctrine.

    1.    Federal Law.

Under the "Erie Doctrine" and the United States Supreme Court's recent decision in Daubert. The Federal Rules of Evidence govern the admissibility of expert testimony in this diversity case. See Daubert v. Merrill-Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786 (1993); Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136 (1965); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938).[1]

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Upjohn specifically directs its attack on the submissibility of Haggerty's case toward one of Haggerty's experts, Dr. Mash. Upjohn argues that Dr. Mash may not render any opinion on medical causation or on the adequacy of warnings because she is not a medical doctor. Again, Upjohn cites the MacMurdo case.

As outlined in the statement of contested facts, Dr. Mash is well qualified to offer testimony on the causal relation between Haggerty's Halcion ingestion and subsequent damages. Federal courts frequently allow non-M.D.s to render opinions relevant to causation. *See, e.g.*, Bowers v. Northern Telecom, Inc., 905 F. Supp. 1004 (N.D. Fla. 1995). Experts with Ph.D.'s in

---

[1]    Haggerty originally filed this action in the Circuit Court in and for Palm Beach County, Florida, on April 25, 1995. Upjohn filed a Notice of Removal on May 19, 1995 and removed this case to Federal Court.

pharmacology have been allowed to testify on the issue of causation. <u>Wells v. Ortho Pharmaceutical Corp.</u>, 788 F.2d 741, 744 n.5 (11th Cir. 1986) (stating that doctor with Ph.D. in pharmacology was "well qualified" to testify as to causation); <u>Zuchowich v. United States</u>, 870 F. Supp. 15 (D. Conn. 1994) (allowing academic pharmacologist experienced and trained in pharmacology to testify as to causation even though witness did not hold a M.D. degree in wrongful death action premised on medical malpractice and misprescribing medication).

Rule 702 does not state a preference for academic training over demonstrative practical experience. <u>Davis v. United States</u>, 865 F.2d 164, 168 (8th Cir. 1988) (citing <u>Circle J. Diary, Inc. v. A. O. Smith Harvestore Products</u>, 790 F.2d 694, 700 (8th Cir. 1986) (allowing a public health investigator to testify as to the probabilities of transmitting disease). Dr. Mash has had significant training and experience in analyzing the effect of medications on the central nervous system and neuropharmacology. Her opinions will be both relevant and helpful to the jury on the issue of causation. The fact that an expert does not have a degree or license in his or her proffered specialty goes to the weight of his or her testimony rather than its admissibility. <u>Dickerson v. Cushman, Inc.</u>, 909 F. Supp. 1467, 1472 (M.D. Ala. 1995).

Many federal courts have allowed similarly-experienced experts to testify, even though they were not medical doctors. <u>Owens v. Concrete Pipe and Products Company</u>, 125 F.R.D. 113, 114-15 (E.D. Pa. 1989) (stating that "[T]he modern trend in the law is to allow experts and subjects such as biochemistry and toxicology to offer opinions on the causes of illness even though they are not medical doctors.") *See also* <u>Roberts v. United States</u>, 316 F.2d 489 (3rd Cir. 1963) (holding that toxicologist, who had extensive experience in researching the chemicals involved was competent to testify in support of Plaintiff's theory that Defendant's chemicals had caused Plaintiff's injuries, even though toxicologist was not a medical doctor); <u>Dawsey v. Olin Corp.</u>, 782, F.2d 1254 (5th Cir. 1986) (Ph.D. in biochemistry with experience in researching the effects of Phosgene on animals was competent to testify on effects on Phosgene on humans); <u>Gideon v. Johns-Manville Sales Corp.</u>, 761 F.2d 1129, 1136 (5th Cir. 1985) (epidemiologist without medical degree competent to testify about risks of cancer from asbestos exposure);

Backes v. Valspar Corp., 783 F.2d 77, 79 (7th Cir. 1986) (collecting cases in which courts permitted toxicologists to testify about the effects of poisonous substances on human health, even though they did not possess a medical degree); Hopkins v. Dow Corning Corp., 33 F.3d 1116 (9th Cir. 1994) (allowing toxicologist to testify regarding silicone's ability to cause immune disorders, even though witness was not a medical doctor).

Furthermore, Haggerty will call several other medical experts as witnesses in this case. One will be Dr. David Baron, M.D. Dr. Baron prescribed Halcion to Haggerty to assist him in sleeping with a neck collar that he was required to wear following his February 1991 operation. As stated above, Dr. Baron opined that Halcion was a contributing cause to the April 20, 1991 incident. See Baron deposition, Exhibit D, pages 90 and 91.

Dr. Baron also testified:

> **Q.** What about your opinion today; is it your opinion today that Halcyon [sic] when used as prescribed and in accordance with its labeling is a safe and effective medication?
>
> **A.** I certainly still prescribe it and I don't believe it's unsafe when used for a limited time. I think at the present time I would limit its use to about a week.

(Baron Deposition, Exhibit D, Page 27)

As causation is an issue of fact for the jury to decide, Dr. Baron's assessment of Haggerty's Halcion use and the safety thereof is relevant and helpful to the jury.

    2.    Florida Law.

Although federal law applies to the issues regarding admissibility of expert opinion testimony, Upjohn claims that Florida law requires a medical doctor to present testimony on the issue of causation. In Upjohn Co. v. MacMurdo, 562 So. 2d 680 (Fla. 1990), the case cited by Upjohn, Ms. MacMurdo brought suit against Upjohn alleging that its drug, Depo-Provera, caused her to experience excessive and continuous menstrual bleeding which ultimately necessitated a hysterectomy. The issue decided by the Florida Supreme Court in

MacMurdo was whether there was sufficient evidence at trial of the inadequacy of the drug warnings. Upjohn interposed the learned intermediary defense, under which the manufacturer's duty to warn of the drug's dangerous side effects is directed to the physician rather than the patient. The court stated, "Therefore, the adequacy or inadequacy of the warning to inform a physician must, except in the more obvious situations, be proved by expert testimony." MacMurdo, at 632 (citing Wyeth Laboratories, Inc. v. Fortenberry, 530 So. 2d 688, 692 (Miss. 1988); Hill v. Squibb & Sons, E.R., 181 Mont. 199, 592 P.2d 1383 (1979); Dion v. Graduate Hospital of University of Pennsylvania, 360 Pa. Super. 416, 520 A.2d 876, 880 (1987)). The court found that there was insufficient evidence of the adequacy of the drug warnings, as no medical expert testified that the package insert was insufficient to put a doctor on notice that the specific symptoms displayed by MacMurdo could result from the use of the drug. The court did not state that only a medical doctor could provide such evidence. The only limitation that can be gleaned from the opinion was that the testimony of a pharmacologist was not probative on the issue of what the term "breakthrough bleeding" meant. Interestingly, the cases cited by the Supreme Court of Florida in support of the expert testimony requirement likewise do not require a medical doctor. In Wyeth Laboratories, Inc. v. Fortenberry, the Supreme Court of Mississippi held that the trial court did not abuse its discretion in allowing a biochemist to testify regarding causation. 530 So. 2d 688, 690. The Hill and Dion cases likewise do not mandate testimony only from medical doctors.

     Florida courts do not discriminate against or state preferences for various types of medical care providers. In Horowitz v. American Motorist Insurance Company, 343 So. 2d 1305 (Fla. 2d DCA 1977), the court held that a chiropractor was competent to give expert testimony on permanency of injury. Section 459.011(2), Florida Statutes, provides that, "Osteopathic physicians licensed under this chapter shall have the same rights as physicians and surgeons of other schools of medicine with respect to the treatment of cases or holding of offices in public institutions." Nurses, psychologists, chiropractors, osteopathic physicians are among the many types of medical care providers that are often expert witnesses.

B.  Inadequate Warnings.

Upjohn argues that Haggerty must present expert testimony from a medical doctor to prove that the labeling for Halcion was inadequate. Upjohn claims that expert testimony regarding the adequacy of warnings "can only be rendered medical doctor." This, too, is an untrue statement. As stated above, the MacMurdo case requires, except in more obvious situations, "expert testimony" by "medical experts." MacMurdo, at 632. The requirement of a "medical doctor" is not found within the MacMurdo opinion.

In Florida, a manufacturer's duty to warn is generally directed to physician rather than the patient. "This is so because the prescribing physician, acting as a 'learned intermediary' between the manufacturer and the consumer, weighs the potential benefits against the damages in deciding whether to recommend the drug to meet the patient's needs." Felix v. Hoffman-LaRoche, Inc., 540 So. 2d 102, 104 (Fla. 1989) (citing Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1276 (5th Cir. ), cert. denied, 419 U.S. 1096, 95 S.Ct. 687 (1974). The learned intermediary doctrine applies where a manufacturer of a prescription drug discharges its duty to warn by providing an adequate warning to the prescribing physician. Amore v. G. D. Searle & Co., Inc., 748 F. Supp. 845 (S.D. Fla. 1990) (emphasis added).

Where there are misstatements or inadequacies in the warning, however, the learned intermediary doctrine does not apply. Felix, 540 So. 2d 102. Upjohn also cites Buckner v. Allergan Pharmaceuticals, Inc. 400 So.2d 8201 (Fla. 1st DCA 1981) which does not state that a medical doctor is required to testify. Buckner, however, states that the learned intermediary doctrine applies "if the product is properly labeled and carries the necessary instructions and warnings to fully apprise the physician of the proper procedures for use and the dangers involved..." Buckner, at 823. A genuine issue exists as to whether the Halcion was properly labeled and packaged by Upjohn and whether Upjohn provided adequate warnings. *See also* Amore, 748 F. Supp. 845, 851 (where warnings were ambiguous, their adequacy must be determined by the jury); Mitchell v. VLI Corp., 786 F. Supp. 966 (M.D. Fla. 1992) (where warnings were not sufficiently accurate, clear and unambiguous, the adequacy of the warnings

must be determined by a jury). In <u>Zanzuri v. G. D. Searle & Co.</u>, 748 F. Supp. 1511 (S.D. Fla. 1990), District Judge Hoeveler denied a drug manufacturer's motion for summary judgment based upon the learned intermediary doctrine where the Plaintiff contended that the warnings contained misstatements which "misled the medical community as to the magnitude of the risks involved." <u>Id</u>. at 1517-18. The Court added:

> When, however, the universe of information from which the physician must piece together a conception of the totality of the risks involved with a product includes misstatements by the product manufacturer, the physician's task becomes Herculean, for he or she must not only supplement the warning, but actually refute the errors communicated by the manufacturer. <u>Id</u>. at 1518.

Thus, whether the warnings contained misstatements or inadequacies are an issue of fact. Moreover, of substantial importance in this case is the <u>nondisclosure</u> by Upjohn of known adverse side effects of Halcion. Thus, the warnings, as written, clearly do not comprise the entire scope of inquiry with regard to the adequacy of the warnings and a genuine issue of fact exists. Both Federal and Florida law merely require "medical experts." As outlined above, Haggerty has sufficient expert testimony to prove the medical aspects of his case.

Dr. Mash is not purporting to testify regarding what the terms on the labels meant to physicians. The record evidence demonstrates that consistent, known adverse side effects were omitted from the Halcion label. Dr. Mash will testify that, among other things, the labelings and warnings of Halcion was inadequate to warn of the increased risk of these adverse side effects of taking the drug for a period of as long as 40 days. Mash's testimony meets the standards for sufficiency of evidence of the inadequacies of Halcion warnings to submit Haggerty's case to the jury.

The testimony of Dr. Baron, the physician who prescribed Halcion for Haggerty, also demonstrates a factual dispute regarding the adequacy of Upjohn's Halcion warnings. Dr. Baron instructed Haggerty to take "One [Halcion] at bedtime as needed." He did not mention the potential dangers associated with concomitant use with other medications or alcohol. See

Dr. Baron deposition, Exhibit D, page 58. Moreover, Dr. Baron prescribed two 30 pill prescriptions of Halcion to Haggerty in 1991. Today, he would limit its use to one week. Given the warnings as to length of use, the jury must decide the adequacy thereof.

The general rule is that the adequacy of warnings is a question of fact. Only where the warnings is "accurate, clear, and unambiguous" may it become a matter of law. Felix, at 105. Haggerty has presented genuine issues of material fact with regard to the adequacy of the warnings for Halcion and, therefore, these issues should be resolved by the jury.

## V. CONCLUSION

Based upon the foregoing, Haggerty states that Upjohn's Motion for Summary Judgment should be denied, as the record evidence demonstrates, genuine issues of material fact to be determined by the jury.

Respectfully submitted,

AKERMAN, SENTERFITT & EIDSON, P.A.
Attorneys for Plaintiff, Michael A. Haggerty
Phillips Point - East Tower
777 South Flagler Drive, Suite 900
West Palm Beach, Florida 33401
407/659-5990

By: _____
James M. McCann, Jr.
Florida Bar No. 182545

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by U.S. Mail, postage prepaid, to all persons listed on the attached Service List this 24 day of July, 1996.

_____
James M. McCann, Jr.