**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 95-8308-CIV-MORENO

MICHAEL A. HAGGERTY,

     Plaintiff,

vs.

THE UPJOHN COMPANY,

     Defendant.

_____/



### FINAL SUMMARY JUDGMENT

Plaintiff, Michael Haggerty, brought this complaint alleging that he was injured as a result of taking Halcion, a prescription sleeping medication manufactured by Defendant, The Upjohn Company. Additionally, Plaintiff alleges that the warnings that accompanied Halcion at the time it was prescribed to him were inadequate. Plaintiff's only expert witness on the issue of medical causation is Deborah Mash, Ph.D, a non-physician pharmacologist. Because the Court finds that Dr. Mash's causation opinion should be excluded pursuant to Daubert v. Merrel Dow Pharmaceuticals, 509 U.S. 579 (1993), Defendant is entitled to summary judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56, based on a lack of admissible expert testimony on essential elements of Plaintiff's claims.

### FACTUAL BACKGROUND

Plaintiff, Michael Haggerty ("Haggerty"), injured his neck on September 1, 1990, while working as a drywall installer, and

underwent surgery for a herniated disc on February 28, 1991. Following the surgery, Haggerty was required to wear a heavy neck brace and collar which hindered his ability to sleep. While in the hospital, Haggerty was administered Halcion to help him sleep, and received a prescription of Halcion upon his release. Haggerty claims that while taking the prescribed Halcion following his release from the hospital, he experienced amnesia and a bizarre change in his normal behavior which caused a variety of injuries. Additionally, Haggerty alleges that the warnings accompanying Halcion at the time it was prescribed to him were inadequate and failed to warn him of the drug's potential side effects.

Halcion Tablets ("Halcion") is a sleeping aid to be used for the treatment of insomnia, and is manufactured by Defendant, The Upjohn Company ("Upjohn"). Halcion, also known as triazolam, is only available pursuant to a physician's prescription, is a member of the benzodiazepine drug class, and has been approved by the United States Food and Drug Administration ("FDA") since 1982. It is manufactured in tablet form and taken orally.

Plaintiff claims that on April 20, 1991, he took one Halcion tablet and went to bed at approximately 6:30 p.m. Plaintiff's next recollection was waking up in a hospital room on the morning of April 21, 1991 with a fractured back, and claims he can recall nothing of what occurred after 6:30 p.m. on the previous night.

2

Plaintiff alleges that the ingestion of Halcion on April 20, 1991 significantly altered his behavior, causing him to become belligerent, aggressive, suffer from hallucinations, and conduct himself in a bizarre and agitated fashion. This bizarre behavior culminated in his leaping from the balcony on the second story of his apartment complex. Additionally, on that same evening, Haggerty assaulted and threatened his live-in girlfriend with a knife, assaulted his eight-year old son and a neighbor, and walked around his apartment and building without clothing.

Haggerty attributes these behavioral changes and the resulting consequences to his ingestion of one Halcion tablet on April 20, 1991. Specifically, Plaintiff alleges that as a result of his conduct on the evening of April 20th, his live-in girlfriend obtained a restraining order to prevent him from returning to his apartment. Additionally, Plaintiff's two children from a prior marriage who were residing with him on April 20, 1991 were adjudicated dependent and were placed in foster care. Upon his discharge from the hospital, Haggerty was arrested for aggravated assault, battery, aggravated battery and indecent exposure due to his conduct on the evening of April 20, 1991. Plaintiff asserts that the bizarre behavioral changes allegedly caused by the ingestion of the one Halcion tablet ultimately led to his imprisonment and loss of his parental rights over his two children.

3

However, Upjohn contends that Plaintiff misused Halcion on April 20, 1991, by ingesting numerous tablets of Halcion and by taking the tablets concurrently with large quantities of alcohol. Upjohn notes Plaintiff's long history of alcohol and poly-substance abuse and his frequent physical attacks on the women with whom he has lived, usually occurring while he was under the influence of alcohol. Defendant alleges that Plaintiff was under the influence of alcohol on April 20, 1991, which could explain his aggressive behavior. Additionally, Defendant argues that Plaintiff has been diagnosed by several expert witnesses in this case as suffering from a psychiatric personality disorder, which is entirely consistent with his behavior on April 20, 1991.

Moreover, Upjohn contends that under applicable law, expert testimony is essential for Plaintiff to establish that Halcion is causally related to his injuries, and that the warnings accompanying Halcion were inadequate. Plaintiff's only expert to offer an opinion to establish these claims is Deborah Mash, Ph.D.. Upjohn moves in limine to exclude the testimony of Dr. Mash, asserting that because Dr. Mash fails to base her opinions on methods and procedures of science, her opinions are irrelevant and should not be admitted into evidence. According to Upjohn, Plaintiff has no admissible expert testimony on medical causation

4

or inadequate warnings, and he cannot establish the essential elements of his claim. Therefore, Defendant maintains that summary judgment for Upjohn is proper. The Court conducted a hearing on September 5, 1996, in Miami, Florida, during which Dr. Mash testified regarding the basis of her expert opinion. Because resolution of Defendant's motion in limine to exclude the opinion testimony of Dr. Mash is crucial to whether Plaintiff can meet his burden with regard to causation, the Court will first address the motion in limine.

## LEGAL ANALYSIS

Upjohn seeks to exclude the opinion testimony of Dr. Mash pursuant to Federal Rules of Evidence 702 and under Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993). Defendant claims that Dr. Mash is not qualified to give either a general or specific causation opinion in this case, and that her causation opinion: (1) is not grounded in the methods and procedures of science, (2) is not relevant, and (3) is sheer speculation based upon an inadequate factual basis. Plaintiff, as the proponent of this testimony, bears the burden of establishing the admissibility of the proffered expert testimony.

Pursuant to Rule 104 of the Federal Rules of Evidence, a district court shall determine preliminary questions regarding the admissibility of evidence. Rule 702 specifically governs the

5

admission of expert testimony, and provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Federal Rule of Evidence 702.

In Daubert, the Supreme Court made clear that the critical concerns of Rule 702 are the reliability and relevancy of the scientific evidence. Before a district court may admit scientific testimony, the Daubert Court established a two-pronged test which requires a district court to determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592. The district court's determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," i.e., reliability and relevancy. Daubert, 509 U.S. at 592.

Under the reliability prong of this analysis, a court should assess whether the reasoning or methodology underlying the expert's theory or technique utilizes valid scientific methods and procedures, without deciding upon the correctness of the expert's

conclusions. The Daubert Court offered several non-exclusive factors to guide federal courts in evaluating whether the particular scientific testimony is reliable. Such factors include: (1) whether the expert's theory or technique has been or can be tested; (2) whether the theory or technique on which the expert's opinion is based has been subjected to peer review and publication; (3) whether the particular scientific technique has a known or potential rate of error, and whether standards exist to control the technique's operation; and (4) whether the technique is generally accepted in the scientific community. Daubert, 509 U.S. at 593-94. These factors are neither exhaustive nor applicable in every case, but serve as "indicia of the reliability" of the theory or technique underlying the expert's testimony. Joiner v. General Electric Company, 78 F.3d 524, 530 (11th Cir. 1996).

Secondly, the court must determine whether the expert opinion is relevant, in that it sufficiently relates to the facts in issue so that it will assist the trier of fact in resolving the factual disputes. Daubert, 509 U.S. at 591; Joiner, 78 F.3d at 530. In this regard, Rule 702 requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility. Daubert, 509 U.S. at 592.

On remand from the Supreme Court, the Ninth Circuit Court of Appeals rendered its decision in Daubert v. Merrell Dow

Pharmaceuticals, Inc., 43 F.3d 1311 (9th Cir. 1995), interpreting the Supreme Court's ruling. The Ninth Circuit considered three significant factors for determining whether the expert's testimony was admissible. The first consideration is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." Daubert, 43 F.3d at 1316. Second, if the expert is not testifying based upon research conducted independent of the litigation, "the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" Id. at 1318. The Court suggested that this could be accomplished "by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." Id. Where the expert's proffered testimony is not based upon research conducted independent of litigation, and has not been subjected to peer review, courts may consider the testimony of other experts. Id.

In determining the admissibility of Dr. Mash's opinion under the Supreme Court's analysis in Daubert and the Ninth Circuit's interpretation, this Court must first identify the basis of Dr. Mash's testimony to ascertain whether the methods and procedures

8

which she used to reach her conclusion are scientifically reliable. The Court's focus "must be solely on principles and methodology not on the conclusions [she] generate[s]." Daubert, 509 U.S. at 595.

## A.   Dr. Mash's Methodology

Dr. Mash has a Ph.D in Pharmacology, and is currently employed as an Associate Professor of Neurology and Molecular and Cellular Pharmacology at the University of Miami School of Medicine.[1]  She has been utilizing various types of scientific methodologies on a day-to-day basis since 1984, and has published numerous articles in the fields of Pharmacology and Neurology.  Dr. Mash has formed a general and specific causation opinion in this case regarding the adverse side effects caused by Halcion.  She has testified that in her opinion, Halcion caused the psychiatric and behavioral effects experienced by Plaintiff on April 20, 1991.  During her deposition and while testifying at the hearing before this Court on September 5, 1996, Dr. Mash set forth the general methodology she utilized in arriving at her expert opinion in this case.   The scientific methodology employed by Dr. Mash relies upon the following:

(a)   Spontaneous Reporting System ("SRS") data of spontaneous reports of adverse medical events involving Halcion collected by

_____

[1]The Court notes that the fact that Dr. Mash is not a medical doctor does not preclude her from offering a causation opinion in this case. See Hopkins v. Dow Corning Corp., 33 F.3d 1116, 1124 (9th Cir. 1994); Bowers v. Northern Telecom, Inc., 905 F.Supp. 1004, 1009 (N.D. Fla. 1995).

the Food and Drug Administration; (Mash Depo., pp 118-119, 200, Transcript of September 5, 1996 Hearing ("Transcript"), p. 11).

(b)  anecdotal case reports appearing in medical literature; (Mash Depo., p. 200; Transcript, p. 11).

(c)  references in textbook to non-Halcion studies of psychomotor agitation in rats and mice; (Mash Depo., p. 201);

(d)  "secondary citations," which are peer review articles summarizing the primary clinical findings, which findings Dr. Mash has not herself read; (Mash Depo., pp. 203, 277; Transcript, pp. 56-57, 62-64).

(e)  newspaper articles from the lay press, and correspondence to the FDA from the Public Citizen, a public interest group. (Mash Depo., p. 118, 126-131, 204).

(f)  Secondary summary of Dr. Anthony Kales which provided detailed listing of primary citations with abstracts of primary findings; (Mash Depo., p. 188, Exhibit 25; Transcript, p. 58).

(g)  European post-marketing surveillance reports. (Mash Depo., p. 133).

### B.  *Daubert Analysis*

The Court will now consider Dr. Mash's methodology in light of the two-pronged analysis set forth in Daubert.  First, in determining the reliability of Dr. Mash's methodology, the Court must ascertain its empirical testability.  This first

consideration, which asks whether the theory or methodology has been subjected to the scientific method, is the most significant of the Daubert factors. See Bradley v. Brown, 42 F.3d 434, 438 (7th Cir. 1994); see also Chikovsky v. Ortho Pharmaceutical Corporation, 832 F.Supp. 341, 345 (S.D. Fla. 1993). "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified." Daubert, 509 U.S. at 593.

In this case, Dr. Mash's ultimate conclusion that Halcion caused the psychiatric and behavioral effects experienced by Plaintiff could be tested, however, Dr. Mash admits that she has not tested her causation opinion or subjected it to this kind of scientific scrutiny. (Mash Depo., p. 214). Moreover, she has not conducted any independent research in this case or any other involving the alleged adverse side effects of Halcion. The causation opinion she rendered in this case appears to be speculative, and not the tested hypothesis envisioned as the basis of scientific knowledge under Rule 702. The Third Circuit, as part of its Daubert analysis, upheld exclusion of causation testimony where the district court found that the witness was really providing "only a hypothesis which he had yet to attempt to verify or disprove by subjecting it to the rigors of scientific testing." In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 764 (1994), *cert denied*, --U.S.--, 115 S.Ct. 1253(1995).

Furthermore, the SRS reports relied upon by Dr. Mash as part of her methodology contain raw information that has not been scientifically or otherwise verified as to cause and effect. (Transcript, p. 47-48). The primary purpose of the SRS is to serve as a signaling system for adverse drug reactions that may not have been detected during pre-market testing, however, according to the FDA, there is no certainty that the suspect drug caused the reaction. (See Defendant's Exhibit 8 to Hearing, "Caveats of Adverse Reactions Reporting System"). The FDA has confirmed that the SRS information cannot be used to estimate the incidents of adverse drug reactions, or for comparisons of drug safety. (Id.; Transcript, p. 47-48).

Secondly, Dr. Mash's methodology has not been subjected to scientific scrutiny through peer review. Dr. Mash has never published her causation methodology, nor has she discussed her causation opinion on Halcion in front of a scientific audience. (Mash Depo., pp. 160, 216). Although peer review and publication do not guarantee the conclusions reached by Dr. Mash are correct, the test under Daubert is not aimed at the correctness of the expert's opinion, but the soundness of her methodology. See Daubert, 43 F.3d at 1318. If nothing else, peer review and publication "increases the likelihood that substantial flaws in methodology will be detected." Daubert, 509 U.S. at 593.

12

As for the third Daubert factor, Dr. Mash's causation methodology has no known or acceptable rate of error because her hypothesis is untested. This methodology is based largely on SRS data, drug experience reports and anecdotal case reports in literature. Mash admits that there is significant but unquantifiable error contained in such data because it is incomplete, and there are non-causation related biases which affect the numbers in these reports. (Mash Depo., p.122; Transcript, p. 47). Specifically, the SRS data contains methodological flaws and biases which make it impossible to calculate an incidence rate. (Transcript, pp. 47-48).

Lastly, there is no general acceptance or support for Dr. Mash's causation methodology in the scientific community. Dr. Mash admits that the SRS reports, clinical case reports and animal work in mice and rats cannot be used to arrive at a cause and effect conclusion. (Mash Depo., pp. 122-125, 222-23). According to Dr. Mash, the generally accepted view in the scientific community is that her methodology can be used to generate hypotheses about causation, but not causation conclusions. (Id. at 222-23). Dr. Mash concedes that scientifically valid cause and effect determinations depend on controlled clinical trials and epidemiological studies, which Dr. Mash has not conducted nor relied on in this case. She cannot cite to any clinical trials or

13

epidemiological studies which show that Halcion creates any statistically significant increased risk for the behaviors allegedly experienced by Plaintiff. (Mash Depo, pp. 89-94, 268). Moreover, there is no evidence that at least a recognized minority of scientists in the field have followed the scientific method practiced by Dr. Mash in this case. See Daubert, 43 F.3d at 1318. Thus, the Court's examination under the four Daubert factors reveals that Dr. Mash's methodology is not scientifically reliable. However, the Court will not end its inquiry here, but will examine the inadequacies in Dr. Mash's formation of her specific causation opinion.

### C.   Deficiencies in Dr. Mash's Methodology

After a review of Dr. Mash's deposition and in-court testimony, the Court finds that the methodology actually employed by Dr. Mash differed from that explained in her testimony. According to her testimony, Dr. Mash employed an inductive reasoning process in this case to arrive at her conclusions, which she called "differential etiology" or "differential diagnosis." (Transcript, p. 9). Pursuant to this method, the expert tries to arrive at a conclusion about the cause of a condition or disease by running through the possibilities and gathering information in an attempt to eliminate all of the other possible causes. Defendant argues that Dr. Mash did not implement a differential diagnosis to

14

arrive at her causation opinion, and was attempting to significantly alter her prior sworn deposition testimony, where she stated that she did not employ such a process with respect to Plaintiff's case. (Mash Depo., p. 136).

The Court finds that through cross-examination at the hearing, Defendant established that Dr. Mash did not employ the method of differential diagnosis in forming her causation opinion. Dr. Mash testified that to apply such a method to reach her hypothesis, she first had to start with an existing body of information about Halcion, affirmative evidence about the drug's adverse effects, and any other factors that could explain Plaintiff's behavior. (Transcript, p. 11). However, an examination of the information from which Dr. Mash formulated her hypothesis reveals its deficiencies.

Dr. Mash concedes that the only way to test whether Halcion causes events such as those experienced by Michael Haggerty, is to conduct large-scale epidemiological studies with a defined population, and look at how many times adverse events occurred in people taking the drug. (Mash Depo., pp. 215-16). However, Dr. Mash has not conducted epidemiologic research on Halcion or any other drug in the benzodiazepine class, nor has she reviewed the clinical or epidemiologic research done on Halcion by others. (Transcript, pp. 26-29, 49). In fact, Dr. Mash testified that she

has conducted no clinical research or animal studies of any kind or description involving sleeping medications. (Id.).

Epidemiological studies analyze the incidence, distribution and etiology of diseases in the human population, and are an important factor in determining the admissibility of an expert's opinion on causation. See Brock v. Merrell Dow Pharmaceuticals, Inc., 874 F.2d 307, 313 (5th Cir. 1989). The Eleventh Circuit has recognized that, "a cause-effect relationship need not be clearly established by . . . epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound. . ." Wells v. Ortho Pharmaceutical Corporation, 788 F.2d 741, 745 (11th Cir. 1986).[2]

In this case, rather than offering epidemiological studies, Dr. Mash relied on case reports and SRS reporting data. The Court has already noted the inherent bias in the SRS data, which cannot be relied upon to form causation opinions. Moreover, Dr. Mash did

---

[2]In Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378 (4th Cir. 1995), the court also held that epidemiological studies were not a necessary component of causation opinion so long as a scientifically sound method is used. In Benedi, the doctors analyzed actual tissue samples, blood tests, differential etiology and peer reviewed literature to reach their conclusions, which are standard diagnostic tools that do not require epidemiology for their validity. Plaintiff in this case cannot point to a similar array of tests and other supporting data on which Dr. Mash relied upon in forming her causation opinion.

not rely on the actual case reports, but only on secondary authorities summarizing the primary clinical findings. In Casey v. Ohio Medical Products, 877 F.Supp. 1380 (N.D. Cal. 1995), the court discussed the distinction between epidemiological studies and compilations of case reports. The court found that while case reports may provide anecdotal support, they are no substitute for a scientifically designed and conducted inquiry. Id. at 1385.

Additionally, Dr. Mash testified that large scale epidemiological studies on Halcion had not been conducted, but if such epidemiological data did exist, her causation opinion would be based on incomplete information. (Mash Depo., pp. 215-16). However, Defendant asserts that Halcion has been studied in hundreds of controlled clinical trials, involving more than 10,000 patients taking Halcion. Moreover, at least twelve (12) structured epidemiological studies have been conducted, involving over 89,000 patients taking Halcion. (See Affidavits of Dr. Kenneth Starz and Dr. Anthony Rothschild, Exhibits "B" and "C" to Defendant's motion; see also Defendant's Hearing Exhibits 10 and 11).

Dr. Mash emphasizes her reliance upon the abstracts of clinical studies which were summarized by Dr. Anthony Kales in his petition to the FDA to remove Halcion from the market, claiming

17

that few clinical studies on Halcion exist.[3]  The Court notes that Dr. Kales' petition appears to be a comprehensive summary of existing information relating to Halcion and its alleged adverse side effects, including: controlled studies involving Halcion; FDA SRS data; Drug Agency Regulatory Actions; case reports of adverse reactions and media reports.  Dr. Kales' petition is not an epidemiological study, but is a compilation of case reports and clinical studies which Dr. Kales summarizes in no more than one paragraph each, concluding with his own opinions.  He does provide an extensive listing of all the references cited to in his report, including the many controlled clinical studies that have been conducted.  However, Dr. Mash conceded that she did not read any of the original case studies which were cited by Dr. Kales, nor did she conduct any independent research based on this data, thus relying on Dr. Kales' brief summaries and conclusions.[4]  The Court

---

[3]The Court has reviewed Dr. Kales' letter of October 21, 1991 to Dr. David Kessler at the FDA and his accompanying petition, upon which Dr. Mash has placed much reliance.  This petition is unpublished.  Dr. Anthony Kales is a Professor and Chairman of the Department of Psychiatry at Penn State.

[4]At the hearing before this Court, Dr. Mash testified that she also relied upon a review article by Anthony J. Rothschild, M.D.  The Court reviewed Dr. Rothschild's article, "Disinhibition, Amnestic Reactions, and Other Adverse Reactions Secondary to Triazolam: a Review of the Literature", published in the Journal of Clinical Psychiatry, December 1992.  Dr. Rothschild reviewed many clinical studies involving Halcion, noting that the twelve studies Dr. Kales published between 1974-85 were based on one single-blind study of seven patients.  He

finds that the summaries of case reports and opinions of Dr. Kales on which Dr. Mash relies in this case provide only anecdotal support for her causation opinion, and should not be the basis of such opinion. See Casey, 877 F.Supp 1380, 1385.[5]

According to Dr. Mash's testimony, in coming to her conclusion about causation through a differential diagnosis, it is important to eliminate all other possible causes of the condition at issue. (Transcript, p. 33). However, it has been established through her in-court and deposition testimony that Dr. Mash failed to eliminate many possible causes of Plaintiff's behavior on the evening of April 20, 1991 before arriving at her specific causation opinion. The Court finds that this is a significant factor which highlights the deficiencies in Dr. Mash's methodology.

First, Dr. Mash did not perform a clinical examination of the Plaintiff, nor did she even meet the Plaintiff before forming her

_____

also noted that Dr. Kales and his colleagues have conducted only three clinical studies with Halcion; the first included eight patients, and the second and third included only six patients. Id. at 76.  Dr. Rothschild concluded that there is little evidence from controlled studies that Halcion causes the adverse effects allegedly experienced by Plaintiff. Id. at 77.

[5]The Casey Court observed that "case reports are not reliable scientific evidence of causation, because they simply described reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation." Casey, 877 F.Supp. at 1385.

19

causation opinion in this case. Additionally, Dr. Mash testified that she did not consider any psychiatric or psychological evaluations or diagnoses of Plaintiff before forming her opinion, although she admitted that psychiatric evaluations ought to be considered when determining the cause and effect of a particular drug. (Mash Depo., pp. 136-37; Transcript, p. 35). Specifically, she was unaware that Susan Hession, a psychologist, had examined Plaintiff and had diagnosed him with a borderline personality disorder, which she admitted could lead to reckless and impulsive behavior, intense anger and loss of control. (Transcript, pp. 41-42; see Hession Depo. of 5/15/96, pp. 63-73). Additionally, she did not read the two psychological evaluations by Dr. Cheri Prohaska, which indicated that because of Mr. Haggerty's personality defects, he was likely to express his anger in an unpredictable and explosive manner, and was at risk for displaying unprovoked and exaggerated aggressive outbursts. (Id. at 42).

Additionally, Dr. Mash testified that another possible cause of Plaintiff's behavior which ought to have been considered in a differential diagnosis was significant drug interaction or abuse of alcohol. (Mash Depo., p. 137; Transcript, pp. 35-36). Moreover, she conceded that all of Plaintiff's behavior on April 20, 1991 could have been produced by alcohol intoxication, and that a significant intake of alcohol would worsen any existing

psychological or psychiatric disorder he may have. (Transcript, p. 44).    However, other than Plaintiff's toxicology report, which reported data on Plaintiff's urine and blood on April 20, 1991, Dr. Mash did not consider Plaintiff's history of alcohol abuse, nor did she consider significant drug interaction. (Mash Depo., p. 137, Transcript, pp. 38-39).    Additionally, she did not consider the fire rescue report of April 20, 1991, which stated that Plaintiff drank approximately six beers and had taken an unknown amount of Valium tablets on that evening.(Transcript, p. 45).   Dr. Mash also failed to review the Order of Adjudication of Dependency and Deposition, issued after the court proceeding regarding the dependency of Plaintiff's children, in which Plaintiff admitted that he consumed seven beers on April 20, 1991.

Dr. Mash also testified that in determining the cause of the behavior exhibited by Plaintiff on the evening of April 20, 1991, a pattern of becoming violent, physically abusive and assaultive while drinking alcohol would be a significant factor to consider. (Mash Depo., p. 137).   According to Dr. Mash, she found nothing in her review of Plaintiff's materials to show that he had ever engaged in anything other than minor domestic altercations involving verbal abuse. (Mash Depo., p. 138).   However, she stated that if there was evidence that Plaintiff physically abused his spouse and children, or threatened his spouse with a knife, than

21

this would significantly affect her opinion. (Mash Depo., pp. 139-41).   Dr. Mash did not read the deposition testimony of either of Plaintiff's prior domestic partners, which describes a long history of domestic violence by the Plaintiff.

Under the four factors cited in Daubert, in addition to the other significant factors considered by this Court, the Court finds that the methodology employed by Dr. Mash was not scientifically sound, and did not rise to the level of scientific knowledge necessary for Dr. Mash to testify as an expert in this case.   As discussed in the preceding paragraphs, the additional concerns of the Court include: Dr. Mash's failure to review relevant epidemiological data; her failure to review the actual case studies summarized in Dr. Kales' article; and her failure to consider the effects of the numerous relevant factors relating to Plaintiff's behavior.   Dr. Mash's causation opinion is based on speculation, and the absence of scientific principles in her methodology deprives her opinion of the reliability necessary for admission in evidence.   In order to be admissible, an expert's testimony must be based on "more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590.

The Court finds as a matter of law that Dr. Mash's opinions are not based on scientifically valid principles, and thus, do not meet the reliability requirements of Rule 702 as interpreted by the

Supreme Court in Daubert.    Hence, the Court need not address

whether Dr. Mash's opinions would be helpful to the trier of fact

on the issue of causation under the second prong of Daubert.    In

accordance with Daubert, this Court performs its gatekeeping role

and excludes the causation testimony of Dr. Mash.    Without this

testimony, Plaintiff cannot establish a genuine issue of material

fact as to causation, and Upjohn is entitled to summary judgment on

this claim.

After finding that Plaintiff cannot establish that his intake

of one Halcion tablet on April 20, 1991 caused his allegedly

bizarre behavior and resulting injuries, the Court need not reach

the merits of Plaintiff's failure to warn claim.    The Court notes

that the subject of Defendant's motion in limine was Dr. Mash's

causation testimony, not her testimony as to the adequacy of

warnings.[6]    However, because a manufacturer's duty to warn of a

drug's hazards runs to the physician, the adequacy or inadequacy of

a manufacturer's warning to inform a physician must also be proved

---

[6]Although the Court acknowledges that an expert need not be
a medical doctor to testify as to the adequacy of a drug's
warning and to render opinions relevant to causation, Dr. Mash's
testimony fails the standards of Daubert.    In addition to the
various deficiencies noted in this opinion, Dr. Mash has
conducted no original research, performed no re-analysis of the
work of others, and never prescribed Halcion to any patient. See
Byrnes v. Honda Motor Co., Ltd., 887 F.Supp. 279, 282 (S.D. Fla.
1994).

by expert testimony.[7] UpJohn Company v. MacMurdo, 562 So.2d 680 (Fla. 1990); Felix v. Hoffmann-LaRouche, Inc., 540 So.2d 102, 104 (Fla. 1989). Plaintiff's failure to warn claim relies on first establishing causation in this case, since Plaintiff must establish a casual link between his injury and the failure to warn of Halcion's alleged adverse side effects. See Christopher v. Cutter Laboratories, 53 F.3d 1184, 1192 (11th Cir. 1995). As the Court has excluded Dr. Mash's causation testimony regarding Halcion's allegedly adverse effects, which is essential to all of Plaintiff's claims, summary judgment must be granted in favor of Defendant in this case.

It appears from a careful review of the motion, responses and attachments that Plaintiff has failed to meet his burden and demonstrate that there is a genuine issue of material fact with respect to medical causation in order to preclude summary judgment. Hence, Defendant is entitled to summary judgment as a matter of

---

[7]The Court notes that Defendant has filed a Motion for Summary Judgment on the failure to warn claim based on the "learned intermediary rule." Although Defendant's motion may have merit, the Court need not reach this issue because Dr. Mash's opinions do not rise to the level of "good science" necessary to testify as an expert in this case on any of Plaintiff's claims.

law.   Federal Rule of Civil Procedure 56; <u>Celotex Corp. v Catrett</u>,

477 U.S. 317 (1986).

    DONE and ORDERED in Chambers at Miami, Florida this 6th day

of December, 1996.

                        FEDERICO A. MORENO
                        UNITED STATES DISTRICT JUDGE

copies provided:
James M. McCann, Jr., Esq.
Thomas M. Sherouse, Esq.
(Andrew See, Esq.
(Paul D. Snyder, Esq.
  One Kansas City Plaza
  1200 Main St.
  Kansas City, Missouri 64105-2118